HUMANA INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15292-80, 17130-82.[1]     Filed January 26, 1987.

---

[1]The cases were consolidated for trial, briefing, and opinion.

*L.L. Leatherman, Charles J. Lavelle, Arthur P. Hipwell, James E. Milliman, Thomas A. Brown,* and *Gary R. Weitkamp,* for the petitioner.
*Scott R. Cox* and *Joel V. Williamson,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in income tax against petitioner for the following taxable years:

| Docket No. | TYE Aug. 31— | Deficiency |
| --- | --- | --- |
| 15292-80 | 1976 | $4,615,905 |
| | 1977 | 9,409,814 |
| 17130-82 | 1978 | 7,723,542 |
| | 1979 | 20,460,078 |

After concessions by the parties, one issue remains for our decision, i.e., to what extent, if any, may petitioner deduct as ordinary and necessary business expenses amounts paid to a wholly owned captive insurance company which were treated as premiums for general liability and medical malpractice insurance.

We first decided the case in a Memorandum Opinion, T.C. Memo. 1985-426. Petitioner filed a motion for reconsideration of the opinion pursuant to Rule 161.[2] The Court granted the motion and withdrew the opinion.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are hereby incorporated by reference.

---

[2] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954 as amended and applicable to the taxable years in issue.

Humana Inc. was incorporated under the laws of Delaware on July 27, 1964. At all pertinent times, the stock of Humana Inc. was publicly traded on the New York Stock Exchange, and its principal place of business was in Louisville, Kentucky.

Humana Inc. is the common parent of an affiliated group of corporations that filed consolidated Federal income tax returns for the taxable years ended August 31, 1976, through August 31, 1979, inclusive, with the Internal Revenue Service Center at Memphis, Tennessee. The parent and subsidiary corporations which filed the consolidated returns will sometimes be referred to collectively as "petitioner."

American Medicorp, Inc. (AMI), was incorporated under the laws of Delaware on January 11, 1968. It was primarily engaged in the business of operating general, acute care community hospitals offering a wide range of medical, surgical, and related services. On February 2, 1978, Humana Inc. acquired 53.4 percent of the common stock of AMI for $85.5 million and 2,849,567 shares of Humana Inc. preferred stock. On September 27, 1978, AMI merged with and into Humana Subsidiary, Inc., a wholly owned subsidiary of Humana Inc. that was incorporated for purposes of the merger. As a result of the merger, Humana Inc. became the owner of all of the outstanding common stock of AMI. The final short period taxable year of AMI ended on September 27, 1978. AMI was merged into Humana Inc. on December 21, 1978.

As of February 1978, AMI held two general liability insurance policies. The primary policy was provided by American Home Assurance Co. (American Home), and an excess layer of insurance was provided by an industry pooling arrangement known as Hospital Underwriting Group, Inc. (HUG).

As of November 1976, petitioner operated 62 hospitals in 16 States and one foreign country, containing 8,586 beds. As of 1979, principally as a result of its acquisition of AMI, petitioner operated 92 hospitals in 23 States and one foreign country, containing 16,529 beds. Petitioner currently operates 87 hospitals owned by 36 corporations.

From 1972 until August 31, 1976, Continental Insurance Co. (Continental) provided petitioner with general liability insurance, including malpractice liability and workers' compensation insurance. As early as 1973, however, there were signs that the availability of such coverage to hospitals was diminishing, and by the mid-1970's, this lack of availability became severe because of the long interval between setting the premium rate, collecting the premiums, and settling claims. During the intervals, loss reserves are established by use of actuarial accounting. Errors in such loss reserves have a strong impact on capital and earnings. Due to changing rules, economic inflation, and misjudgments, insurers were adjusting their loss reserves and premiums in many lines of casualty insurance, including malpractice insurance. On May 7, 1976, Continental advised petitioner by letter that it would be unable to renew its insurance coverage when it expired on August 31, 1976.

Through the services of its insurance broker, Marsh & McLennan, Inc. (Marsh & McLennan), Humana Inc. attempted to obtain general and professional liability insurance from third-party insurers, but was unsuccessful. On June 1, 1976, Marsh & McLennan recommended that petitioner immediately take steps to establish a captive insurance company.

At the time that the Marsh & McLennan letter was received, petitioner was considering the following options:

(1) going uninsured;

(2) creating a trust fund or reserve for self- insurance;

(3) combining with other hospital companies in a 5-year insurance pooling arrangement; or

(4) establishing a captive insurance company.

Petitioner rejected option (1) because it concluded that it was not strong enough to sustain the burden of catastrophic risk if it went uninsured. It rejected option (2) because, first, it felt that this option would not allow it access to commercial insurance markets for certain excess protection which it regarded as essential; second, some 40 percent of its business was under Medicare and Medicaid, and at least the former would not permit reimbursement for

additions to the reserves;[3] and third, it was clear that payments into such a reserve fund would not be deductible for Federal income tax purposes. Petitioner rejected option (3) because, first, it had doubts about the financial viability of its potential affiliates in such a pooling arrangement; second, one such potential affiliate owned hospitals in what were regarded as the worst States for malpractice claims; and third, it was reluctant to bind itself to such an arrangement for a 5-year period. Option (4) was considered the most attractive because it possessed none of the perceived disadvantages associated with the other options and it would provide a regulated method of insuring risks which would both isolate funds for the settlement of claims and satisfy interested lenders, mortgagees, and securities analysts. In addition, option (4) would provide access to world reinsurance and excess insurance markets.

On July 14, 1976, petitioner sought the approval of the Insurance Department of Colorado to establish a captive insurance company under Colorado law to insure against losses due to fire, general liability, medical malpractice, including hospitals, and other casualties.

On August 5, 1976, Health Care Indemnity, Inc. (HCI), was incorporated under the Colorado Corporation Act. The articles of incorporation of HCI state the following purposes for its incorporation:[4]

to conduct, engage in and carry on the business of making all kinds of insurance and reinsurance authorized to be made under the Colorado Captive Insurance Company Act * * * and to conduct, engage in and carry on all other activities incident to conducting such insurance and reinsurance business.

From August 20, 1976, to October 12, 1982, HCI qualified as a captive insurance company under Colorado law.

Humana Holdings, N.V. (HHNV), is a Netherlands Antilles corporation organized and incorporated on August 4, 1976. Humana Inc. purchased all of the capital stock of HHNV for $250,000, and continues to own it. The only business purpose for HHNV was to assist in the capitalization of HCI.

---

[3]Prior to 1976, petitioner's insurance premiums were apparently considered an allowable cost for Medicare coverage, viz, Medicare would reimburse hospitals for the pro rata cost of certain expenditures, including insurance, for services provided to Medicare patients.

[4]This excerpt is from the original articles filed on Aug. 5, 1976, rather than the restated articles filed on Dec. 24, 1981.

Petitioner used the device of HHNV because it concluded that to do otherwise would have required the consolidation of HCI and Humana Inc. for tax purposes, requiring Humana Inc. to abandon its fiscal year in favor of a calendar year.

At the time of the initial capitalization of HCI, 150,000 shares of preferred stock and 250,000 shares of common stock were issued. Of these, HHNV purchased the preferred stock for $250,000 in cash, which it still owns, and Humana Inc. purchased the common stock for $750,000, paid in irrevocable letters of credit issued in favor of the Commissioner of Insurance of the State of Colorado. At all times since such capitalization, each share of common stock of HCI has been entitled to five votes, and each preferred share to one vote.

There were no agreements between HCI and Humana Inc. or its subsidiaries which would require the latter to contribute additional capital to HCI for the payment of any losses. However, on May 31, 1979, Humana Inc. contributed $1,323,000 to the capital of HCI. This represented a refund paid by HUG to Humana Inc. after AMI merged with Humana Subsidiary, Inc.

HCI issued the following policies during the taxable years in issue, identifying Humana Inc. and affiliated and subsidiary corporations, in the numbers shown, as named insureds:

| | Policy period | | Coverage | |
| Policy No. | From | To | Number of corporations | Number of hospitals |
| --- | --- | --- | --- | --- |
| 1001 | 9/1/76 | 8/31/77 | 22 | 64 |
| 1003 | 9/1/77[5] | 9/1/78 | 22 | 59 |
| HCI-90178 | 9/1/78 | 9/1/79 | 48 | 97 |

In addition, policy number HCI-60178, was effective from June 1, 1978, at which time Humana Inc. owned 53.4 percent of AMI's common stock, until June 1, 1979. HCI replaced AMI's primary policy with American Home, and incorporated by reference the terms of AMI's excess coverage under its policy with HUG.

---

[5]While the policy entered into evidence reflects a commencement date of Aug. 31, 1977, we have accepted the stipulation of the parties that it commenced on Sept. 1, 1977.

The charges for the foregoing policies accrued ratably throughout the policy periods. During the taxable years in issue, the following amounts were paid by petitioner to HCI for such policies and were deducted on the consolidated Federal income tax returns:

| TYE Aug. 31— | Policy No. | Payments |
|---|---|---|
| 1977 | 1001 | [6]$5,703,571 |
| 1978 | 1003 | [7]5,865,986 |
| 1979 | HCI-90178 | [8]7,582,893 |
|  | HCI-60178 | [9]1,903,125 |
| Total |  | 21,055,575 |

The foregoing charges were developed by Marsh & McLennan pursuant to standard industry practice generally by applying to the average number of occupied beds, a composite rate developed by a rating organization known as Insurance Service Offices. The resulting amounts were billed by HCI to Humana Inc. on a monthly basis and were paid by Humana Inc. in a single payment representing the total premiums for all of the hospitals. Later, by means of an allocation formula, portions of the foregoing amounts were charged to the subsidiaries.[10]

Each of the policies provided three types of coverage: Coverage A—personal injury; Coverage B—property damage; and Coverage C—professional liability, including per-

---

[6]The stipulation of the parties at one point describes this amount as $5,703,511. We agree with petitioner, however, that the record reflects that this was a computation error. At all times since 1971, Humana Inc. has owned only 62.35 percent of a corporation, Brentwood Hospital, Inc. (Brentwood). Brentwood has never been a part of the affiliated group which filed consolidated returns and respondent did not disallow the $89,460 attributable to it. When this sum is subtracted from the total amounts paid on policy number 1001, or $5,793,031, the difference is $5,703,571.

[7]For reasons described in note 6 above, this amount is computed as the difference between total amounts paid on policy number 1003, or $5,963,006, and the payment by Brentwood, or $97,020.

[8]For reasons described in note 6 above, this amount is computed as the difference between total amounts paid on policy number HCI-90178, or $7,663,533, and the payment by Brentwood, or $80,640.

[9]This amount is computed as the difference between total amounts paid on policy number HCI-60178, or $2,878,125, and $975,000, which is the amount attributable to AMI and its subsidiaries prior to Sept. 27, 1978, when AMI became a wholly owned subsidiary of Humana Inc., and which was not claimed by petitioner on the return for the taxable year ended Aug. 31, 1979.

[10]The amounts paid by Humana Inc.—representing the total of premiums for all the hospitals operated by Humana Inc. and its subsidiaries—were charged back to the subsidiaries based upon the number of occupied beds. Adjustments were made if, for example, a hospital operated by the subsidiary had a teaching program, an intern residence program, or nurse anesthetists as opposed to doctor anesthetists.

sonal injury relating to certain professional services (i.e., malpractice). Each policy also included a "good samaritan endorsement" under which professional employees, acting outside of their capacity as employees, were covered for certain occasional professional services not rendered for their personal benefit.

Under each of the four policies, the following were considered as "an insured:"

a. The named insured;

b. Any officer, hospital administrator * * * , stockholder, or member of the Board of * * * Directors or Governors of the named insured while acting for * * * the named insured.

c. Under Coverages A and B, any employee, student or volunteer worker of the named insured while acting within the scope of his duties * * * ;

\* \* \* \* \* \* \*

f. Under Coverage C, any person included in any of the employee classifications for which coverage is afforded under this policy, as indicated in Item 5 of the Declarations, while such person is acting within the scope of his duties as an employee * * *

Pursuant to item 5 of the Declarations, any employee of the insured was covered, including those professional employees who were licensed residents, interns, physicians, surgeons, or dentists, except that physicians, surgeons, and dentists were excluded under policy number HCI-60178. Under such policy, however, coverage was extended to independent contractors licensed as physicians and practicing in the hospital emergency room or attending to emergencies on the hospital premises. After June 1, 1979, this coverage was also provided for those insured under policy number HCI-90178. Generally, no coverage was provided for non-employee physicians, since they carried their own insurance.

Humana Inc., on forms 10-K filed with the Securities and Exchange Commission for the taxable years in issue, described the coverage provided by HCI as follows: The Insurance Subsidiary will insure the risks of the Company only, and it will only provide insurance to physicians who are actually employed by the Company. In such documents, "Company" is defined as Humana Inc. and its subsidiaries.

At all times pertinent in this case, payments for coverage of each of the categories described above were paid by

petitioner and were not charged to the employee or other individual involved.

Pursuant to policies numbered L00L, L003, and HCI-90178, the liability of HCI was limited to $2 million per occurrence under Coverages A, B, and C, $2 million in the aggregate under Coverages A and B, and $10 million in the aggregate under Coverage C.[11] Pursuant to policy number HCI-60178, the liability of HCI was limited to $500,000 per occurrence and $2.4 million in the aggregate for each category of covered risks.

The insurance coverage of petitioner during the taxable years in issue also included multiple layers of excess coverage placed with third-party insurance carriers, over and above the foregoing primary layer provided by HCI.

In policies numbered 1002 and 1004, HCI also provided certain excess comprehensive general coverage to petitioner for the respective periods September 1, 1976, to August 31, 1977, and September 1, 1977, to August 31, 1978. All of the liability under these policies was reinsured by HCI with third-party reinsurance companies. The Commissioner allowed petitioner to deduct the premiums for these policies. With the exception of these policies, during the taxable years in issue HCI did not reinsure the risks of losses with other insurance companies nor did petitioner obtain policies with third-party insurers which were reinsured by or with HCI.

At all times involved in this case HCI filed separate Federal income tax returns based upon a calendar year. The returns and its books and records were maintained using the accrual method of accounting.

During the taxable years in issue, HCI had no employees other than its officers, most of whom were also officers of Humana Inc. By contract dated August 1976, Marsh & McLennan provided HCI with resident managing officers and a variety of administrative and management services, including consulting, underwriting, risk control, record-keeping, and accounting services. At all times involved in this case, Underwriters Adjusting Co. provided, by written contract, claims administration and claims service for HCI.

---

[11]Effective June 1, 1979, the aggregate liability under Coverage C for policy number HCI-90178 was increased to $13 million.

After concessions, the sole issue for decision is whether the following amounts are deductible as insurance premiums:

| TYE Aug. 31— | Amount |
|---|---|
| 1977 | $5,703,571 |
| 1978 | 5,865,986 |
| 1979 | 9,486,018 |
| Total | 21,055,575 |

OPINION

We previously decided this case in Memorandum Opinion, T.C. Memo. 1985-426. Petitioner filed a motion for reconsideration, which the Court granted, and the Court withdrew the opinion.

Humana Inc. and its subsidiaries operated hospitals whose insurance coverage was canceled. Humana Inc. incorporated a captive insurance subsidiary which it jointly owned with a wholly owned foreign subsidiary. The captive insurance subsidiary purported to provide insurance coverage for Humana Inc. and its other subsidiaries. Humana Inc. paid to the captive insurance subsidiary amounts which it treated as insurance premiums. It charged portions of these amounts to its operating subsidiaries.

Two issues are presented for our decision:

(1) Are the sums paid to HCI by Humana Inc. on its own behalf deductible as ordinary and necessary business expenses for insurance premiums, and

(2) Are the sums charged by Humana Inc. to the operating subsidiaries deductible on the consolidated income tax returns as ordinary and necessary business expenses for insurance premiums.

For convenience, the first issue may be described as the "parent-subsidiary" issue and the second issue may be described as the "brother-sister" issue. These represent the relationships between the entity which purports to be the insured and the captive insurance subsidiary which purports to be the insurer.

We have previously decided the parent-subsidiary issue in *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), and *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948 (1985), on appeal (9th Cir., Dec.

13, 1985). Our decision in *Carnation* has been followed in disallowing the deductions in *Beech Aircraft Corp. v. United States*, 797 F.2d 920 (10th Cir. 1986); *Stearns-Roger Corp. v. United States*, 774 F.2d 414 (10th Cir. 1985); and *Mobil Oil Corp. v. United States*, 8 Cl. Ct. 555 (1985). *Carnation* was applied, but with a different result, in *Crawford Fitting Co. v. United States*, 606 F. Supp. 136 (N.D. Ohio 1985). Our decision in *Clougherty* has been followed in *Anesthesia Service Medical Group v. Commissioner*, 85 T.C. 1031 (1985), on appeal (9th Cir., May 14, 1986), *Stearns-Roger*, and *Mobil*. Accordingly, we decide the parent-subsidiary issue in favor of respondent under the authority of *Carnation* and *Clougherty*, and it is unnecessary to restate our analysis.

Petitioner also contends that even if the subject payments failed to constitute deductible insurance premiums, they are nonetheless deductible under section 162 "because they are 'ordinary and necessary' business expenses 'paid or incurred' during the taxable years" in issue. In *Clougherty*, we answered this argument by holding that in disallowing the payments as insurance premiums, we reclassified them as nondeductible. 84 T.C. at 960. The Claims Court in *Mobil* followed this approach. 8 Cl. Ct. at 567.

Payments to a captive insurance company are equivalent to additions to a reserve for losses. *Stearns-Roger Corp. v. United States, supra* at 415; *Mobil Oil Corp. v. United States, supra* at 567. It has long been recognized that sums set aside as an insurance reserve are not deductible. *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978), cert. denied 440 U.S. 946 (1979); *Spring Canyon Coal v. Commissioner*, 43 F.2d 78 (10th Cir. 1930), cert. denied 284 U.S. 654 (1931). If the payments to HCI are not deductible as insurance premiums, they are not deductible at all.

In addition, petitioner argues for deductibility of portions of the amounts paid by Humana Inc. to HCI. It contends that the expense of providing insurance to certain employees, officers, directors, and contractors covered under the policies in issue should be deductible. As to this argument, petitioner cites no authority to support its apparent contention that the risks, whether arising from purely corporate

acts or acts of specific corporate employees, were other than the risks fully retained within the meaning of *Carnation* and *Clougherty*. Indeed, we believe that it would be difficult to find any such persuasive authority where, as here, the coverage of certain employees, officers, and others was clearly an integral part of the protection of the parent corporation. In this regard, on its forms 10-K filed by Humana Inc. with the Securities and Exchange Commission for the taxable years in issue, it described the coverage provided by HCI as follows: The Insurance Subsidiary will insure the risks of the Company only, and it will only provide insurance to physicians who are actually employed by the Company. In such documents, "Company" is defined as Humana Inc. and its subsidiaries.

We turn now to the brother-sister issue, which is an issue of first impression in this Court. It has, however, been decided in favor of the Government in *Stearns-Roger* and *Mobil*. Those cases extended the rationale of *Carnation* and *Clougherty* to the brother-sister factual pattern. We likewise extend the rationale to the brother-sister factual pattern of the instant case. We emphasize that our holding is based upon the factual pattern presented in this case. We recognize that corporate factual patterns may differ. See *Crawford Fitting Co. v. United States, supra.* In addition, other factors may be present, e.g., reinsurance agreements, guarantees, etc.

Petitioner, in support of its motion for reconsideration argues that in the *Mobil* case it has support for holding that the risk was shifted among the subsidiaries. We disagree. *Mobil* involved not only the deductibility of payments from the parent and the subsidiaries to the captive insurance subsidiary but also whether the payments from the subsidiaries to the captive insurance subsidiary resulted in constructive dividends to the parent. The Claims Court held that the arrangement did not cause the risk of loss to be shifted and the payments were, therefore, not deductible as insurance premiums. It also held that the payments did not result in constructive dividends to the parent. 8 Cl. Ct. at 568.

Petitioner relies upon the portion of the Claims Court opinion concerning constructive dividends in which the

Court describes the business purposes involved. The business purpose for the payments is not relevant in deciding the deductibility of the payments as insurance premiums because the payments have been reclassified as nondeductible additions to a reserve for losses.

This is the first case on captive insurance arrangements in which expert testimony has been presented to this Court. *Carnation* was decided on the parties' motions for summary judgment and *Clougherty* was fully stipulated. In the instant case, three expert witnesses testified and the Court received written reports of their opinions. Dr. Irving Pfeffer testified for petitioner and Dr. Irving Plotkin and Mr. Richard Edward Stewart testified on behalf of respondent. Dr. Plotkin testified in the *Stearns-Roger, Beech Aircraft*, and *Mobil* cases cited above. Dr. Pfeffer and Mr. Stewart did not testify in any of the previously decided cases.

The opinion of Dr. Pfeffer provides little reasoning and is not very convincing. It simply concludes that the arrangements between Humana Inc., its operating subsidiaries, and HCI constitute insurance. Furthermore, it is contrary to the cases cited above.

Dr. Plotkin and Mr. Stewart prepared a joint opinion. Their opinion is consistent with our decisions in *Carnation* and *Clougherty* and contains very persuasive reasoning. The analysis portion of the Plotkin-Stewart expert report is as follows:

### Analysis

This case presents the question of whether payments made by a corporation to its wholly owned subsidiary in exchange for formal contracts of "insurance" constitute deductible premiums for federal income tax purposes. The respondent has taken the position that such transactions are not deductible since they are devoid of any *risk transfer* (also referred to as risk shifting), an element which he believes to be critical to the definition of insurance for federal income tax purposes.

The respondent has requested us to analyze whether or not the various transactions between and among Humana, AMI, HCI, and * * * , labeled "insurance" by the petitioner, can actually be considered "insurance" from the standpoint of how the insurance and economic professions view them.

Commercial insurance is a mechanism for transferring the financial uncertainty arising from pure risks faced by one firm to another in exchange for an insurance premium. Such financial uncertainty is caused by the possibility of certain types of occurrences that may have only

adverse financial consequences. A corporation such as Humana that places its risks in a captive insurance company that it owns, either directly or through a parent corporation, subsidiary, or a fronting company, is not relieving itself of this financial uncertainty. The reason for this is simply that such corporation, through its ownership position, still holds the benefits and burdens of retaining the financial consequences of its own risks. It has a dollar for dollar economic interest in the result of any "insured" peril.

A term frequently used for the act of insuring is underwriting. An essential element of the concept of underwriting is the transference of uncertainty from one firm to another, generally from the one whose activities naturally give rise to the uncertainty to one whose investors are in the business of accepting such uncertainty for the potential profit they can earn thereby.

Thus, insurers, and the interests that own them, are risk takers. They assume the financial consequences of the risks for others in return for a premium payment. * * *

The essential element of an insurance transaction from the standpoint of the insured (e.g., Humana and its hospital network), is that no matter what insured perils occur, the financial consequences are known in advance. Thus the insured, for the price of its premium, is protected from such financial consequences, within the limits of its policy. By reason of its contract, the insured is indemnified against loss from a defined hazard or risk. In essence, the premium represents the substitution of a small, but certain "loss", for a potentially large and uncertain loss.

To have a true transfer of risk, another risk-bearer must replace the insured. To speak of a transfer of risk to a fund or reserve established by the insured is merely to describe "self-insurance". A captive insurance subsidiary, such as HCI, represents a recognized form of risk retention or "self-insurance". Many scholars have noted that the very term, "self-insurance", is a misnomer, since there cannot be any insurance without risk transfer.

Accordingly, a firm cannot insure itself. This does not mean, however, that a firm cannot or should not choose to retain the financial uncertainty of the hazards it faces, nor attempt to predict and minimize the financial consequences of its risks. Whether its portfolio of risks is large or small, there is always uncertainty concerning what will be the actual financial consequences of the events that may occur during some future time period. In fact, the larger the collection of risks, the greater is the uncertainty concerning the actual result. The only way a firm can relieve itself but only of the financial uncertainty is by entering into a contract whereby some other firm will assume that uncertainty. * * *

A firm placing its risks in a captive insurance company in which it holds a sole or predominant[12] ownership position, is not relieving itself of financial uncertainty. It is, through its ownership, retaining the

---

[12]The instant case presents only sole ownership of the captive insurance company. We express no opinion where the ownership of the captive insurance company is only predominant.

burdens and benefits of assuming the financial responsibility of its own risks. This concept has been recognized by scholars for at least twenty years:

"It is apparent that the nature of the captive-insurance device involves not only the element of insurance through 'transfer' of risks, but also the notion of self-insurance since the 'owners' of the risks insured therein are the 'owners' of the insurer. The fortunes of the two entities are interlocked to the extent that the risks insured in the captive are not reinsured. In this sense, captive insuring can be considered a risk-retention device similar to self-insurance. In fact, if self-insurance involves the conduct of risk managment 'according to all the sound principles and practices employed by insurance companies' it might be argued that captive insuring is the epitome of the self-insurance device * * * (Robert S. Goshay, 'Captive Insurance Companies,' *Risk Management*, Ch. VI, Richard D. Irwin, Inc., Homewood, Illinois, 1964, pp. 80-121, at p. 85.)"

* * * the recognition and description of captive insurance as a form of risk retention and self-insurance permeates the theoretical and applied insurance and accounting literature. * * *

When a firm actually obtains insurance, the firm's financial costs associated with the insured peril are independent of whether or not the peril actually comes to pass, or the extent of the financial damage caused by the peril. Its costs, in fact, are equal to the insurance premium and *known in advance with certainty*. Just the opposite obtains with any form of self-insurance, be it on the corporation's books or through the books of the firm's captive insurance subsidiary. The actual costs are a direct, dollar-for-dollar function of what perils in fact come to pass and what their financial consequences turn out to be.

* * * * * * *

A question that perplexes some when initially confronted with the captive insurance area is whether or not respondent has chosen to treat, either directly or indirectly, two separate legal entities as one single economic unit. One's first impression might be that, since a parent corporation can deal at arm's-length with a subsidiary in other areas besides insurance and have such transactions respected by respondent, "insurance premiums" paid to a captive should not be treated any differently. The answer to this paradox lies in the unique nature of insurance transactions relative to other types of parent/subsidiary transactions.

True insurance relieves the firm's balance sheet of any potential impact of the financial consequences of the insured peril. For the price of the premiums, the insured rids itself of any economic stake in whether or not the loss occurs. * * * [However] as long as the firm deals with its captive, its balance sheet cannot be protected from the financial

vicissitudes of the insured peril.[13]

On the other hand, if a parent sold its subsidiary a hotel, it is true that the ultimate fate of that hotel will be reflected on the balance sheet. However, whether or not the transferred property could accurately, for tax and other purposes, be described as a hotel is not a function of whether or not the parent's balance sheet reflects the ultimate fate of the property. This, however, is precisely opposite from the case of insurance. A transaction can be fairly described as insurance if, and only if, the parent's balance sheet is immunized from the financial consequences of the insured peril. * * *

It is well recognized that insurance premiums are accorded unique and favorable treatment within the Internal Revenue Code. The same is true for other specific economic activities, such as the depletion allowance accorded to oil wells. We believe that if company A sold company B a farm but in the contract described it as an oil well, company B would not be eligible for depletion allowances.

* * * * * * *

## CONCLUSION

So long as the firm does not transfer to another the ultimate responsibility for the financial consequences of its risks, it remains the risk bearer and faces the uncertainty of each year's actual financial losses. The attempted placing of a firm's risks, directly or indirectly, in its "insurance affiliates" did not accomplish a transference of risk, or constitute an insurance transaction as a matter of insurance theory or economic reality. We find our conclusion in complete accord with the clear theoretical and applied teachings of the economics, insurance theory, risk management, and captive self-insurance literatures.

In *Beech Aircraft*, the District Court commented favorably on the testimony of Dr. Plotkin, found it to be relevant, and overruled the taxpayer's objections to the testimony.[14] No court has refused to accept the testimony of Dr. Plotkin on captive insurance.

Dr. Plotkin testified in both of the brother-sister cases. The District Court, in *Stearns-Roger*, adopted the analysis of Dr. Plotkin. The Claims Court, in *Mobil*, based upon the

---

[13]For financial reporting purposes, Humana Inc. prepared consolidated financial statements which included all of its subsidiaries. Accordingly, its investment in HCI stock would be eliminated on the consolidated financial statements. The net effect is that after the elimination of intercompany accounts the assets of HCI are included in the consolidated financial statements. Furthermore, even if HCI were not included in the consolidated financial statements, Humana Inc. would properly account for its investment in HCI stock using the equity method. Accounting Principles Board Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock," AICPA (New York 1971). Accordingly, the investment of Humana Inc. in HCI stock would reflect the changes in the retained earnings of HCI.

[14]*Beech Aircraft Corp. v. United States*, an unreported case (D. Kan. 1984, 54 AFTR 2d 84-6173, 84-2 USTC par. 9803).

opinion of Dr. Plotkin, concluded that the risk of loss was always with the parent corporation and was not shifted away from the parent by reason of payments among the brother-sister subsidiaries. The Claims Court commented upon the testimony of Dr. Plotkin as follows:

Dr. Irvin Plotkin, * * * was qualified as an expert in the economics of insurance. Dr. Plotkin testified that Mobil did not actually purchase insurance as the term is defined in the field of economics. Essentially, Dr. Plotkin testified that a wholly-owned subsidiary cannot insure its parent because there is no risk transference. The risk of loss remains within the economic unit. As a shareholder of a wholly-owned insurance affiliate, the parent company bears the risks of the subsidiary, suffers from losses sustained by the subsidiary, and benefits from gains realized by the subsidiary. * * * [8 Cl. Ct. at 563.]

Mr. Stewart, in his testimony in the instant case, agreed with Dr. Plotkin as to the shifting of risk. Mr. Stewart has imposing credentials, among them he was superintendent of insurance for the State of New York from 1967 through 1970. From a pragmatic standpoint he perceived no difference between the payments at issue and self insurance.

The joint opinion of Dr. Plotkin and Mr. Stewart proceeds from the proposition that there must be a transfer or shifting of risk for the transactions to represent insurance. This conforms to "hornbook law" that a taxpayer cannot deduct as insurance premiums amounts set aside in its own possession to compensate itself for perils which are generally the subject of insurance. *Stearns-Roger Corp. v. United States*, 774 F.2d at 416; *Carnation Co. v. Commissioner*, 640 F.2d at 1013; *Mobil Oil Corp. v. Commissioner*, 8 Cl. Ct. at 566; *Clougherty Packing Co. v. Commissioner*, 84 T.C. at 958; *Pan-American Hide Co. v. Commissioner*, 1 B.T.A. 1249, 1250 (1925). Thus, a taxpayer cannot deduct as insurance premiums amounts which it sets aside as a reserve to cover future casualties.

If we decline to extend our holdings in *Carnation* and *Clougherty* to the brother-sister factual pattern, we would exalt form over substance and permit a taxpayer to circumvent our holdings by simple corporate structural changes. Assume that Corporation A incorporates a wholly owned captive insurance company, Corporation B, which insures the risks of A. Under our holdings in *Carnation* and *Clougherty*, A could not deduct the premiums it pays to B.

Let us alter the corporate structures to the brother-sister factual pattern. The shareholders of Corporation A exchange their stock for the stock of Corporation B, which was incorporated for the sole purpose of holding the stock of A. A is now the wholly owned subsidiary of B. A continues to be the operating corporation. B then incorporates a wholly owned captive insurance company, Corporation C. Corporation C insures the risks of Corporation A, the operating company. Corporations A and C are brother-sister corporations of a common parent, Corporation B.

If we do not extend the holdings of *Carnation* and *Clougherty* to the brother-sister factual pattern, the payments from Corporation A to Corporation C would be deductible as insurance premiums. Such a holding, of course, would be contrary to the decisions of the 10th Circuit in *Stearns-Roger* and the Claims Court in *Mobil*, both of whom relied upon our decisions in *Carnation* and *Clougherty*.

Respondent again argues that we should adopt his "economic family" concept which he articulated in Rev. Rul. 77-316, 1977-2 C.B. 53. We declined to adopt that concept in *Carnation Co. v. Commissioner*, 71 T.C. at 413, and also declined to adopt it in *Clougherty Packing Co. v. Commissioner*, 84 T.C. at 956. We again decline to adopt that concept because it does not tell all of the story. As we have seen from *Crawford Fitting* an "economic family" may exist which results in the shifting of risk. Instead of applying a broad approach such as "economic family" to captive insurance, we hold that it is more appropriate to examine all of the facts to decide whether or to what extent there has been a shifting of the risk from one entity to the captive insurance company.

We conclude that there was not the necessary shifting of risk from the operating subsidiaries of Humana Inc. to HCI and, therefore, the amounts charged by Humana Inc. to its subsidiaries did not constitute insurance. Accordingly, the amounts paid to HCI are not deductible as ordinary and necessary business expenses.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, PARKER, WHITAKER, HAMBLEN, COHEN, JACOBS, PARR, and WILLIAMS, *JJ.*, agree with the majority opinion.

———

WHITAKER, *J.*, concurring: We are faced in this case with another aspect of the captive insurance problem—the deduction of insurance premiums between brother-sister corporations. The majority purports to decline as in *Carnation Co. v. Commissioner*, 71 T.C. 400, 413 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), and *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 956 (1985), on appeal (9th Cir., Dec. 13, 1985), to adopt respondent's "economic family" concept. See Rev. Rul. 77-316, 1977-2 C.B. 53 at 54. However, the majority refers repeatedly with apparent approval to decisions of other courts, including the opinion of the Court of Appeals of the Ninth Circuit affirming our opinion in *Carnation*, all of which follow *Carnation* and adopt the economic family concept. The majority also quotes extensively with approval from the testimony of respondent's experts, Dr. Plotkin and Mr. Stewart, who have fully swallowed respondent's economic family concept. The dissenting opinion here, as in the prior cases, accuses the majority of having in fact adopted the economic family concept and charges us with failing to follow *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943). I think it unfortunate that we—the majority—have allowed respondent's buzzword—economic family—to produce so much strained rationalization that we appear to have lost sight of the real issue, whether or not the contracts in question are insurance contracts.

It bears emphasizing at the outset that what this Court has so far dealt with is a single affiliated group, including the insurance entity, consisting of one parent corporation and one or more wholly owned subsidiaries. The majority correctly notes (note 12) that our opinion is limited to the consequences of insuring with a wholly owned captive. I suggest what we have decided and all that we have decided in this case and its two predecessors is simply that on the particular facts of these three cases we do not have

insurance for tax purposes. Here the only insurance relationship is that which is purportedly created between entities which are related to each other through a single parent with no unrelated persons being insured or having material interests in any of the entities involved. In so doing, we have not "pierced any corporate veil" or done violence to *Moline Properties, Inc.*

There is also another equally compelling basis for our decision. Necessary elements of insurance are risk-shifting and risk-distributing. *Helvering v. Le Gierse*, 312 U.S. 531 (1941); *Commissioner v. Treganowan*, 183 F.2d 288 (2d Cir. 1950). These two decisions are fundamental to this insurance issue. In *Helvering v. Le Gierse, supra,* the Supreme Court recognized that there were two parties to the contract—an insurance company and an insured individual who were distinct legal entities. There was a contract of insurance and a related annuity contract, each of which were legally binding contracts. As Justice Murphy said:

> Considered together, the contracts wholly fail to spell out any element of insurance risk. It is true that the "insurance" contract looks like an insurance policy, contains all the usual provisions of one, and could have been assigned or surrendered without the annuity. * * * The fact remains that annuity and insurance are opposites; in this combination the one neutralizes the risk customarily inherent in the other. * * * [312 U.S. at 541.]

The Second Circuit in *Commissioner v. Treganowan, supra,* defined risk-shifting as effected by a contract between the insurer and the insured, each of whom gambles on the risk. Risk-distributing on the other hand reduces the potential loss by spreading its cost throughout a group. In *Humana* as in *Carnation* and *Clougherty*, we looked at the facts and at the several corporate entities involved, and found neither risk-shifting nor risk-distributing. We have not invalidated the contracts; we simply found that the contracts involved were not contracts of insurance.

The majority here states "Payments to a captive insurance company are equivalent to additions to a reserve for losses. * * * It has long been recognized that sums set aside as an insurance reserve are not deductible."[1] Again

---

[1] It has been suggested with considerable logic that "The basic concept in a capture program * * * may even have grown out of the early defeats of the self-insurers." Bradley & Winslow,

that is a correct analysis under these facts. If a single entity, party A, undertakes to indemnify an unrelated entity, party B, from a specific risk, at least superficially the risk has been shifted. But in order for the transaction to be economically sound for both parties, the premium would have to approximate the present value of the risk, equating to a reasonable self-insurance reserve. There has certainly been no distribution of the risk. However such a relationship might be characterized, it is not insurance. In the real world, this hypothetical transaction would not occur. Moreover, given that self-insurance reserves are not deductible, to characterize a contract between a parent and its wholly owned captive subsidiary, with no other insurance business, as insurance, would exalt form over substance. For these two reasons, *Carnation* and *Clougherty* were inevitable. One does not need the economic family concept for this result. And given *Carnation* and *Clougherty* as correctly decided, the form over substance rationale is alone sufficient to prevent taxpayers from altering the result in the parent-subsidiary circumstance by the simple expedient of creating a sister insurance captive to insure its brother operating company. It requires very little further rationalization to reach the conclusion that in fact, as opposed to form, there is no risk-shifting or risk-distributing no matter where in the affiliated wholly owned group one places the captive insurance subsidiary.

I emphasize again that only in these factual contexts have we found that the purported insurance contract does not qualify as such for tax purposes. Whether or not the contract should be recognized as insurance for any other purpose is not an issue before us. In reaching this result we have not collapsed or looked behind the separate corporate existence of any party. As the Supreme Court did in *Le Gierse*, we have merely applied to the facts before us the accepted definition of insurance and the well known "form over substance" doctrine. That we may someday be called upon to determine how much dilution from 100-percent

---

"Self-Insurance Plans and Captive Insurance Companies—A Perspective on Recent Tax Developments," 4 Am. J. Tax Policy 217, at 233 (1985).

control or how much insurance business with unrelated entities is necessary to achieve risk-shifting and risk-distributing is a probable fact of life, but it should not interfere with our decision in this case.

STERRETT, CHABOT, NIMS, PARKER, HAMBLEN, JACOBS, and WILLIAMS, *JJ.*, agree with this concurring opinion.

---

HAMBLEN, *J.*, concurring: In *Clougherty Packing Co. v. Commissioner*, I expressed my concern about the "economic family" concept.[1] Noting that respondent's assertion of the economic family concept did not square with *Moline Properties v. Commissioner*, 319 U.S. 436 (1943), I felt that the *Moline Properties* issue was injected unnecessarily into *Clougherty* by way of the economic family concept analogy. I could see little difference between the economic family concept described in Rev. Rul. 77-316, 1977-2 C.B. 53, and the determination made by the majority in *Clougherty*. However, I concluded that the *Clougherty* arrangement was not a true insurance arrangement as there was no risk distribution. Following a similar analysis, I concur only in the result of the majority opinion and agree in principle with Judge Whitaker's concurring opinion.

The majority cites proponents of the economic family concept as authority to support its determination. This, I feel, is neither appropriate nor necessary for the following reasons.

First, one has only to thumb through any text or hornbook on corporate tax law to see the arsenal available to respondent in related corporation transactions. Yet this plethora of available tools, whether codified or judicially developed, apparently is inadequate for respondent in this area, so he asserts an "economic family" theory which has ominous ramifications within and beyond the captive insurance area.[2]

---

[1] See Hamblen, J., concurring, *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 961 (1985).

[2] For example, it has been noted that respondent's "experts" have stated in another case that the economic family principle is dependent upon piercing the corporate veil. See Bradley & Winslow, "Self Insurance Plans and Captive Insurance Companies - A Perspective on Recent Tax Developments," 4 Am. J. of Tax Policy 217, 248 n. 101 (1985).

More importantly, under the economic family theory asserted by respondent, there seems to be no real distinction between disregarding transactions between related corporations and disregarding their separate status. However, I submit that, generally, transactions between *any* entities, related or unrelated, should be repudiated or recharacterized only if they are not legally or factually what they purport to be. The majority's reliance on financial reports to buttress its conclusion only fuels the economic family fire; it consolidates two entities for tax purposes which are not permitted to file consolidated tax returns and, without a basis for so doing, erodes the long-standing principle of *Moline Properties v. Commissioner, supra.*

For these reasons, I strongly believe that we should decide the issue solely on a lack of risk-shifting and risk-distribution basis. In this respect, there appears to be no tax avoidance scheme. The intercorporate contractual arrangements are not determined to be shams. Indeed, a business purpose for the transactions is obvious because the entities could not obtain insurance coverage elsewhere.

If we are to abrogate the insurance transaction between these related entities, we should do so by simply saying, without more, that there is neither shifting nor distribution of risk and, consequently, no valid insurance arrangement. If we cannot say that, or must say more than that, then it seems to me that we have valid insurance transactions between separate, though related, entities.

In sum, I believe that the economic family theory may conflict with fundamental principles of tax law by invoking attribution among related corporations where it has not been legislated by Congress.[3] I see no reason to give such a concept credence, as the majority is doing here. Consequently, I concur only in the result reached by the majority.

WHITAKER, *J.*, agrees with this concurring opinion.

---

KÖRNER, *J.*, concurring and dissenting in part: So far as the majority opinion holds that the premiums paid to HCI

---

[3]See Bradley & Winslow, 4 Am. J. of Tax Policy at 246-255, *supra.*

by petitioner Humana Inc. (the common parent corporation) for insurance *on itself* may not be deducted as insurance premiums, I agree that such an outcome is controlled by our holdings in *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), and *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948 (1985), on appeal (9th Cir. 1985). I therefore concur in that portion of the opinion.

With respect to the majority's holding that the same result obtains with respect to premiums paid by the Humana subsidiaries to HCI for comparable insurance on *them* and their employees, I dissent.

Neither *Carnation* nor *Clougherty* are authority for denying deductions for the amounts paid, as insurance premiums, by Humana Inc.'s subsidiaries to HCI. Said wholly owned subsidiaries of Humana Inc. are related to HCI as brother-sister corporations. In *Carnation*, we found that Three Flowers (the wholly owned offshore insurance subsidiary) was organized "to carry on the business of insurance and reinsurance of various multiple line risks including those of petitioner [Carnation] and its subsidiaries." 71 T.C. at 402. However, the issue of the deductibility of insurance premiums where the insurance contract is between corporations related as brother-sister was not decided. It was stipulated that for purposes of the case, all premiums were to be deemed as having been paid and deducted by Carnation.[1] In *Clougherty*, the wholly owned subsidiary, Lombardy's, only business was the reinsurance of Clougherty's workers' compensation coverage. Clougherty was the taxpayer-petitioner. No subsidiaries of Clougherty related to Lombardy as brother-sister were involved.

In contrast with the factual situations presented in *Carnation* and *Clougherty*, the record herein shows that: (1) The wholly owned subsidiaries of Humana Inc. were insured under the subject policies; (2) the subsidiaries are related to HCI as brother-sister, not asparent-subsidiary; (3) the amounts due under the subject policies, as premiums, were billed by HCI to Humana Inc. on a monthly basis; (4) Humana Inc. paid the total amount billed by HCI on a

---

[1] Carnation and its subsidiary corporations that were required to file Federal income tax returns each filed separate Federal income tax returns rather than a consolidated return.

monthly basis; (5) later, the foregoing amounts were allocated and charged back by Humana Inc. to its appropriate subsidiaries; and (6) the subsidiaries are petitioners here.[2] See sec. 1.1502-77(a), Income Tax Regs. Moreover, respondent does not contend that the existence of the said subsidiaries as separate and viable tax entities should be ignored, or that they were organized in order to unlawfully avoid the payment of tax. Respondent similarly does not contend that the subsidiaries did not engage in any business activities.

I find the majority's holding with respect to the premiums paid by the Humana subsidiaries to HCI (the brother-sister situation) deficient in at least two important respects:

(1) The majority relies heavily upon, and quotes extensively from the joint opinion of respondent's expert witnesses Plotkin and Stewart. A careful examination of that opinion, however, leads me to the conclusion that it gives no support to the position of the majority on the brother-sister question. As the quotations show, the thrust of the report is aimed at the parent-subsidiary question, concluding that there is no true insurance (hence no deductible premium) because there is no transfer of the risk of loss from the "insured" parent to its wholly owned subsidiary "insurer." The reasoning apparently is that the subsidiary's stock is shown as an asset on the parent's balance sheet. If the parent suffers an insured loss which the subsidiary (HCI in this case) has to pay, the assets of the subsidiary insurer will be depleted by the amount of the payment. This, in turn, will reduce the value of the subsidiary's shares as an asset of the parent (Humana), so that, in effect, the assets of the "insured" parent are bearing the loss as far as true economic impact is concerned. As the experts' joint opinion (quoted by the majority) clearly puts it:

True insurance relieves the firm's balance sheet of any potential impact of the financial consequences of the insured peril. For the price of the premiums, the insured rids itself of any economic stake in whether or not

[2] As stated in the majority's findings of fact, *supra*, Humana Inc. and its domestic subsidiaries filed consolidated Federal income tax returns for the years in issue. Respondent conceded that HCI was not a member of the affiliated group of corporations of which Humana Inc. was the common parent. HCI was not able to and did not file its income tax returns on a consolidated basis with Humana Inc. and its subsidiaries. Secs. 1501, 1504(a), 1504(b). HCI filed separate returns for all the pertinent years.

the loss occurs. * * * [However] as long as the firm deals with its captive, its balance sheet cannot be protected from the financial vicissitudes of the insured peril.

*    *    *    *    *    *    *

CONCLUSION

So long as the firm does not transfer to another the ultimate responsibility for the financial consequences of its risks, it remains the risk bearer and faces the uncertainty of each year's actual financial losses. The attempted placing of a firm's risks, directly or indirectly, in its "insurance affiliates" did not accomplish a transference of risk, or constitute an insurance transaction as a matter of insurance theory or economic reality. We find our conclusion in complete accord with the clear theoretical and applied teachings of the economics, insurance theory, risk management, and captive self-insurance literatures.

Accepting, arguendo, that this is an accurate statement and is in line with our reasoning in *Carnation* and *Clougherty*, it nevertheless provides no support to the majority's position in the brother-sister situation. Humana's insured subsidiaries own no stock in HCI, nor vice versa. The *subsidiaries'* balance sheets and net worth would in no way be affected by the payment of an insured claim by HCI.[3] It follows that when the Humana subsidiaries paid *their own* premiums for their own insurance, as the facts show, they shifted their risks to HCI. The rationale of *Carnation* and *Clougherty* thus does not apply, and such premiums should be allowable as deductions to the subsidiaries.

Upon what other basis can these premiums be disallowed? That is the subject of my next point of disagreement with the majority.

(2) The majority in this case for the first time extends the rationale of *Carnation* and *Clougherty* to the brother-sister

---

[3]The majority, at note 13 of the majority opinion, states that Humana Inc. (the common parent), filed consolidated balance sheets for all of its subsidiaries (including HCI) for *financial* reporting purposes. The effect, says the majority, is that the assets of HCI were included in the consolidated statements. I question whether this would be proper for *tax* reporting purposes, where HCI was not and could not be a member of the consolidated returns which were filed. See my note 2, *supra*.

The majority further states that even if HCI was not properly includable in Humana's consolidated balance sheet for *tax* reporting purposes, nevertheless Humana would reflect its investment in HCI's stock under the "equity" method. Ergo, if HCI pays an insured claim against one of its brother/sister subsidiaries, its assets, and therefore the assets of Humana *parent* will decrease, and therefore Humana *parent* is the one who truly bears the loss. Consistent with this reasoning, is respondent prepared to allow a deduction to Humana *parent* when HCI pays an insured claim against one of the brother/sister hospital subsidiaries?

situation. In addition, the majority cites and relies upon *Stearns-Roger Corp. v. United States*, 774 F.2d 414 (10th Cir. 1985), and *Mobile Oil Corp. v. United States*, 8 Cl. Ct. 555 (1985). See also *Beech Aircraft Corp. v. United States*, 797 F.2d 920 (10th Cir. 1986). A reading of these cases shows that each of them, either explicitly or implicitly, has adopted the "economic family" concept advanced by respondent in Rev. Rul. 77-316, 1977-2 C.B. 53, where it is said:

> there is no economic shifting or distributing of risks of loss with respect to the risks carried or retained by the wholly owned * * * subsidiaries * * * [T]he insuring parent corporation and its domestic subsidiaries, and the wholly owned "insurance" subsidiary, through separate corporate entities, represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss. To the extent that the risks of loss are not retained in their entirety by * * * or reinsured with * * * insurance companies that are unrelated to the economic family of insureds, there is no risk-shifting or risk-distributing, and no insurance, the premiums for which are deductible under section 162 of the Code.
>
> Thus, the amounts paid by the [parents], and their domestic subsidiaries, and retained by [the insurance subsidiaries], respectively, are not deductible under section 162 of the Code as "ordinary and necessary expenses paid or incurred during the taxable year." Because such amounts remain within the economic family and under the practical control of the respective parent in each situation, there has been no amount "paid or incurred." * * *

In spite of its citation of, and reliance upon the above cases, the majority in the instant case (as in *Carnation* and *Clougherty*) again purports to refuse to accept respondent's economic family argument. Instead, the majority passes over the substantial issues which are raised with the airy statement that "we hold that it is more appropriate to examine all the facts to decide whether or to what extent there has been a shifting of the risk from one entity to the captive insurance company."

I find the majority's attempted distinction here to be disingenuous and entirely unconvincing. What facts are there which support the conclusion here that there was no shifting of risk from the Humana subsidiaries to HCI? The subsidiaries, *who paid their own premiums for their own insurance,* had no ownership in HCI, the insurer, nor did HCI have any ownership in them. If we are to recognize HCI and the hospital subsidiaries as valid separate business entities,

conducting active legitimate businesses, and devoid of sham—neither respondent nor the majority herein says to the contrary—then how can we say that there was no shifting of risk from the hospital-subsidiaries/sisters to the insurer/brother (HCI), without violating the time-honored rule that each taxpayer is a separate entity for tax purposes? *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943); *Burnet v. Commonwealth Imp. Co.*, 287 U.S. 415 (1932). The only way it can be done is to ignore the separate entities of Humana, its hospital subsidiaries, and HCI, to call them all one "economic family" and to say that what happens to one happens to all of them. On the facts of the brother-sister situation presented here, I think that is what the majority is doing, and it ought to say so forthrightly. I would still disagree with such a position, but at least it would have the virtue of candor. Other than "economic family," I can think of no theory on which the result here can be rationalized, and the majority has not articulated any.

This Court has never adopted respondent's economic family theory,[4] and has expressed—justifiably—its concern regarding the adoption of such theory and its application to other areas of the tax law.[5] The theory of *Helvering v. LeGierse*, 312 U.S. 531 (1941), may have been adequate to sustain the holdings in *Carnation* and *Clougherty*, where only a parent and its insurance subsidiary were involved. It cannot be stretched to cover the instant brother-sister situation, where there was nothing—equity ownership or otherwise—to offset the shifting of risk from the hospital subsidiaries to HCI. If the majority is to accomplish the fell deed here, "a decent respect to the opinions of mankind requires that they should declare the causes which impel them"[6] to such a result.

SHIELDS, CLAPP, SWIFT, GERBER, WRIGHT, and WELLS, JJ., agree with this concurring and dissenting opinion.

---

[4]See *Carnation Co. v. Commissioner*, 71 T.C. 400, 409-410 (1978); *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 956, 957, 959 (1985).

[5]*Clougherty Packing Co. v. Commissioner*, 84 T.C. at 959 (majority opinion); 962-964 (Hamblen, J., concurring); 964 (Jacobs, J., concurring).

[6]T. Jefferson, The Declaration of Independence (1776).