Buch, J., concurring: To the extent respondent is arguing that a captive insurance arrangement between brother-sister corporations cannot be insurance as a matter of law, we need not reach that issue. In Rev. Rul. 2001-31, 2001-1 C.B. 1348, 1348, the Internal Revenue Service stated that it would “no longer invoke the economic family theory with respect to captive insurance transactions.” And in Rauenhorst v. Commissioner, 119 T.C. 157, 173 (2002), we held that we may treat as a concession a position taken by the IRS in a revenue ruling that has not been revoked. Because Rev. Rul. 2001-31 has not been revoked, we could treat the economic family argument as conceded. At the same time the IRS abandoned the economic family theory, it made clear that it would “continue to challenge certain captive insurance transactions based on the facts and circumstances of each case.” Rev. Rul. 2001-31, 2001-1 C.B. at 1348. Then, in a series of revenue rulings, the IRS shed light on the facts and circumstances it deemed relevant. See Rev. Rul. 2005-40, 2005-2 C.B. 4; Rev. Rul. 2002-91, 2002-2 C.B. 991; Rev. Rul. 2002-90, 2002-2 C.B. 985; Rev. Rul. 2002-89, 2002-2 C.B. 984. The concise opinion of the Court sets forth facts and circumstances supporting its conclusion. I write separately to respond to points made in Judge Lauber’s dissent. I. Legacy’s Policies Taking into account the nature of risks that Legacy insured, Legacy was sufficiently capitalized. A. Long-Tail Coverage During each of the years in issue Legacy insured three types of risk: workers’ compensation, automobile, and general liability. Policies relating to these risks are generally referred to as long-tail coverage because “claims may involve damages that are not readily observable or injuries that are difficult to ascertain.” See Acuity v. Commissioner, T.C. Memo. 2013-209, at *8-*9. Workers’ compensation insurance, which generated between 66% and 73% of Legacy’s premiums[1] during the years in issue, “is generally long tail coverage because of the inherent uncertainty in determining the extent of an injured worker’s need for medical treatment and loss of wages for time off work.” Id. An insurer pays out claims relating to long-tail coverage over an extended period. B. Rent-A-Center’s Insurance Program Rent-A-Center did not obtain insurance solely from Legacy; Rent-A-Center also obtained insurance from multiple unrelated third parties. Legacy was responsible for only a portion of each claim (e.g., the first $350,000 of each workers’ compensation claim during 2003). To the extent that a claim exceeded Legacy’s coverage, a third-party insurer was responsible for paying the excess amount. Rent-A-Center obtained coverage from unrelated third-party insurers for claims of up to approximately $75 million. Therefore, extraordinary losses would not affect Legacy’s ability to pay claims because they would be covered by unrelated third parties. C. Allocation Formula Premiums were actuarially determined. At trial respondent conceded that Aon “produced reliable and professionally produced and competent actuarial studies.” Legacy relied on these studies to set premiums. Once Legacy determined the premium, Rent-A-Center allocated it to each operating subsidiary in the same manner that it allocated premiums relating to unrelated insurers. In a captive arrangement, a parent may allocate a premium among its subsidiaries. See Humana Inc. & Subs. v. Commissioner, 881 F.2d 247, 248 (6th Cir. 1989) (“Humana Inc. allocated and charged to the subsidiaries portions of the amounts paid representing the share each bore for the hospitals each operated.”), aff’g in part, rev’g in part and remanding 88 T.C. 197 (1987); Kidde Indus., Inc. v. United States, 40 Fed. Cl. 42, 45 (1997) (“National determined the premiums that it charged Kidde based in part on underwriting data supplied by Kidde’s divisions and subsidiaries * * * Kidde used these same data to allocate the total premiums among its divisions and subsidiaries.”). II. The Parental Guaranty Citing a footnote in Humana, see Lauber op. p. 39, Judge Lauber’s dissenting opinion asserts that the existence of a parental guaranty is enough to justify disregarding the captive insurance arrangement. That footnote, however, addresses only situations in which there is both inadequate capitalization and a parental guaranty, concluding: “These weaknesses alone provided a sufficient basis from which to find no risk shifting and to decide the cases in favor of the Commissioner.” Humana Inc. & Subs. v. Commissioner, 881 F.2d at 254 n.2 (emphasis added). Here, the fact finder did not find inadequate capitalization. And the mere existence of a parental guaranty is not enough for us to disregard the captive insurer; we must look to the substance of that guaranty. As the opinion of the Court finds, the parental guaranty was created to convert deferred tax assets into general business assets for regulatory purposes. See op. Ct. p. 22. The circumstances relating to its issuance, including that the parental guaranty was issued to Legacy and that it was limited to $25 million — or, less than 10% of the total premiums paid to Legacy — support the conclusion that it was created solely to encourage the Bermuda Monetary Authority to allow Legacy to treat DTAs as general business assets. In contrast, the cases that have found that a parental guaranty eliminates any risk shifting involved either a blanket indemnity or a capitalization agreement that resulted in a capital infusion in excess of premiums received. And even then, the indemnity or capitalization agreement was coupled with an undercapitalized captive. Accordingly, those cases are distinguishable from the situation presented here. Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835 (6th Cir. 1995), rev’g T.C. Memo. 1993-585, involved an insurance subsidiary established to provide reinsurance for the parent and its subsidiaries. After incorporating the captive, Malone & Hyde entered into an agreement with a third-party insurer to insure both its own and its subsidiaries’ risks. Id. at 836. The third-party insurer then reinsured the first $150,000 of coverage per claim with the captive. Id. Because the captive was thinly capitalized — it had no assets other than $120,000 of paid-in capital — Malone & Hyde executed “hold harmless” agreements in favor of the third-party insurer. Id. These agreements provided that if the captive defaulted on its obligations as reinsurer, then Malone & Hyde would completely shield the third-party insurer from liability. Id. In deciding whether the risk had shifted, the court held that “[w]hen the entire scheme involves either undercapitalization or indemnification of the primary insurer by the taxpayer claiming the deduction, or both, these facts alone disqualify the premium payments from being treated as ordinary and necessary business expenses to the extent such payments are ceded by the primary insurer to the captive insurance subsidiary.” Id. at 842-843. In short, Malone & Hyde, Inc. had a thinly capitalized captive insurer and a blanket indemnity. Here, neither of those facts is present. The facts in Kidde Indus., Inc. are quite similar to those in Malone & Hyde, Inc. Kidde incorporated a captive and entered into an insurance agreement with a third-party insurer who in turn entered into a reinsurance agreement with the captive. Kidde Indus., Inc., 40 Fed. Cl. at 45. As in Malone & Hyde, Inc., the captive was significantly under-capitalized, and Kidde executed an indemnification agreement to provide the third-party insurer with the “level of comfort” needed before it would issue the policies. Id. at 48. Again, the court held that Kidde retained the risk of loss and could not deduct the premiums. Id. Carnation Co. v. Commissioner, 71 T.C. 400 (1978), aff’d, 640 F.2d 1010 (9th Cir. 1981), involved slightly different facts. A captive reinsured 90% of the third-party insurer’s liabilities under Carnation’s policy. Id. at 403. As part of this arrangement, the third-party insurer ceded 90% of the premiums to the captive and the captive paid the third-party insurer a 5% commission based on the net premiums ceded. Id. Carnation provided $3 million of capital to the captive— an amount that was well in excess of the total annual premiums paid to the captive — because the third-party insurer had concerns about the captive’s capitalization. Id. at 404. The Court held that the reinsurance agreement and the agreement to provide additional capital counteracted each other and voided any insurance risk. Id. at 409. In affirming the Tax Court, the Court of Appeals for the Ninth Circuit held that, in considering whether the risk had shifted, the key was that the third-party insurer would not have issued the policies without the capitalization agreement. Carnation Co. v. Commissioner, 640 F.2d at 1013. Those cases are distinguishable because they all involved undercapitalized captives. As explained previously, the opinion of the Court found that Legacy was adequately capitalized. Further, in each of the three cases above, the parent provided either indemnification or additional capitalization in order to persuade a third-policy insurer to issue insurance policies. Here, Discover Re provided insurance before Legacy’s inception and continued providing coverage after Legacy was formed. The parental guaranty was issued to Legacy for the singular purpose of allowing Legacy to treat the DTAs as general business assets. Additionally, the guaranty amounted to only $25 million. This small fraction of the $264 million in premiums for policies written by Legacy during the years in issue does not rise to the level of protection provided by the total indemnities in Malone & Hyde, Inc. and Kidde Indus., Inc. When we consider the totality of the facts, the parental guaranty appears to have been immaterial. This conclusion is bolstered by the facts that the parental guaranty was unilaterally withdrawn by Rent-A-Center in 2006 and that Rent-A-Center never contributed any funds to Legacy pursuant to that parental guaranty. III. Consolidated Groups Judge Lauber’s dissent refers to a hodgepodge of facts about how Rent-A-Center operated its consolidated group as evidence that Legacy’s status as a separate entity should be disregarded. Examples of the facts cited in that dissent are that Legacy had no employees and that payments between it and other members of the Rent-A-Center consolidated group were handled through journal entries. See Lauber op. p. 44. In the real world of large corporations, these practices are commonplace. For ease of operations, including running payroll, companies create a staff leasing subsidiary and lease employees companywide. Or they hire outside consultants to handle the operations of a specialty business such as a captive insurer. Legacy, like Humana, hired an outside management company to handle its business operations. Compare op. Ct. note 6 (Legacy engaged Aon to provide management services) with Humana Inc. & Subs. v. Commissioner, 88 T.C. at 205 (Humana engaged Marsh & McLennan to provide management services). And it is unrealistic to expect members of a consolidated group to cut checks to each other. Rent-A-Center and Legacy did what is commonplace — they kept track of the flow of funds through journal entries. So long as complete and accurate records are maintained, the commingling of funds is not enough to require the disregarding of a separate business. See, e.g., Kahle v. Commissioner, T.C. Memo. 1991-203 (finding that the taxpayer “maintained complete and accurate records” notwithstanding the commingling of business and personal funds). Corporations filing consolidated returns are to be treated as separate entities, unless otherwise mandated. Gottesman & Co. v. Commissioner, 77 T.C. 1149, 1156 (1981). It may be advantageous for a corporation to operate through various subsidiaries for a multitude of reasons. These reasons may include State law implications, creditor demands, or simply convenience, but “so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.” Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Even the consolidated return regulations make clear that an insurance company that is part of a consolidated group is treated separately. See sec. 1.1502— 13(e)(2)(ii)(A), Income Tax Regs. (“If a member provides insurance to another member in an intercompany transaction, the transaction is taken into account by both members on a separate entity basis.”). Thus, if a corporation gives due regard to the separate corporate structure, we should do the same. IV. Conclusion The issue presented in these cases is ultimately a matter of when, not whether, Rent-A-Center is entitled to a deduction relating to workers’ compensation, automobile, and general liability losses.[2] Because the IRS has conceded in its rulings that insurance premiums paid between brother-sister corporations may be insurance and the Court determined that, under the facts and circumstances of these cases as found by the Judge who presided at trial, the policies at issue are insurance, Rent-A-Center is entitled to deduct the premiums as reported on its returns. See op. Ct. pp. 13-25. Foley, Gustafson, Paris, and Kerrigan, JJ., agree with this concurring opinion. Legacy’s premiums attributable to workers’ compensation liability were $28,586,597 in 2003; $35,392,000 in 2004; $36,463,579 in 2005; $39,086,374 in 2006; and $45,425,032 in 2007. If the Court had determined that the policies were not insurance, then Rent-A-Center would nevertheless have been entitled to deduct the losses as they were paid or incurred. See sec. 162. By forming Legacy and giving due regard to its separate structure, Rent-A-Center achieved some acceleration of deductions relating to losses that would otherwise be deductible, along with other nontax benefits. See op. Ct. p. 11.