**KIDDE INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 447–88T.**

United States Court of Federal Claims.

Dec. 31, 1997.

Herbert L. Camp and Douglas D. Broadwater, New York City, for plaintiff.

Stuart J. Bassin, with whom were Loretta C. Argrett, Assistant Attorney General, and Mildred L. Seidman, Washington, DC, for defendant.

## OPINION

ANDEWELT, Judge.

### I.

In this tax refund action, plaintiff, Kidde Industries, Inc. (Kidde), seeks a refund for income taxes it allegedly overpaid for tax years 1977 and 1978. This action is before the court after trial on two of the four counts presented in plaintiff's amended complaint. The first count, Count II, raises issues concerning the proper tax treatment of premiums paid by a parent company for insurance ultimately provided by a wholly owned subsidiary, i.e., where the parent company's insurance is provided by a "captive insurer." The second count, Count IV, alleges that plaintiff is entitled to certain work incentive (WIN) tax credits.

### II.

Turning first to the "captive insurer" issue, during the 1970s, Kidde was a broad-based, decentralized conglomerate with approximately 15 separate operating divisions and 100 wholly owned subsidiaries, each of which Kidde treated as an independent profit center. Prior to 1977, Kidde had insurance agreements with Travelers Insurance Company (Travelers) under which Travelers provided master insurance policies covering workers' compensation and automobile and general (including products) liability. Each Kidde division and subsidiary had the option either to participate in these master policies or to "opt out" if it could secure coverage from another insurer on a more cost-effective basis. Kidde's divisions and subsidiaries generally chose to participate in the Travelers program, but some did not.

In 1976, in the midst of a products liability insurance crisis in which many insurance companies either ceased or significantly restricted their coverage of products liability in the United States, Travelers informed Kidde that it would not renew Kidde's products liability insurance policy for 1977. Given the

general reluctance of insurance companies to offer products liability coverage, Kidde determined that in order to secure such insurance from a new provider, Kidde would have to offer these insurers the entire package that Travelers previously had provided, not just products liability. Most of the insurance companies Kidde approached refused to quote any price for insurance that included products liability coverage and those that did extend offers quoted rates that were so high as to be unacceptable to Kidde. Some offers, in effect, would have required Kidde to pay virtually all of its products liability claims.

Kidde responded to the limited availability of products liability insurance by seeking the aid of outside firms and consultants, including American International Group (AIG), a large multi-national insurance conglomerate. The plan that Kidde and these outside sources developed and implemented involved Kidde incorporating in Bermuda a wholly owned insurance subsidiary. On December 22, 1976, Kidde incorporated Kidde Insurance Company Ltd. (KIC) with an initial capital of $1 million. Kidde then purchased workers' compensation and automobile and general (including products) liability insurance from two subsidiaries of AIG, National Union Fire Insurance Company and American Home Assurance Company (hereinafter collectively referred to as National). National, in turn, entered "facultative reinsurance agreements" with KIC pursuant to which KIC reinsured a portion of the risks National had insured for Kidde. These National–KIC agreements involved National covering Kidde's workers' compensation and automobile and general (including products) liability claims and KIC assuming the first $1 million of each workers' compensation and automobile and general liability claim, and the first $2.5 million of each products liability claim. As with its prior policies with Travelers, Kidde allowed its divisions and subsidiaries either to participate in the National program or to "opt out" and secure coverage from other insurers.

In sum, because of the products liability insurance crisis, Kidde could not convince an established insurance company to provide, at a satisfactory price, all of the insurance Travelers previously had provided. Kidde was able, however, to acquire from National insurance equivalent in scope to that provided by Travelers but only upon the condition that Kidde create a wholly owned subsidiary with which National would reinsure a significant portion of that insurance. On January 1, 1977, National issued two master insurance policies covering the Kidde divisions and subsidiaries that opted to participate in the program. National and KIC did not enter the "facultative reinsurance agreements" pursuant to which KIC reinsured a portion of the risks National insured for Kidde under these policies until April 1977.

### III.

For 1977 and 1978, Kidde paid National premiums of $11,624,819 and $13,671,100, respectively. National then ceded $9,461,017 and $11,509,432 of these premiums, respectively, to KIC for reinsurance.[1] National determined the premiums that it charged Kidde based in part on underwriting data supplied by Kidde's divisions and subsidiaries, including payroll data for workers' compensation, sales data for general liability, and number of cars for automobile liability. Kidde used these same data to allocate the total premiums among its divisions and subsidiaries. For 1977 and 1978, Kidde allocated approximately 60 percent of its total payments to National to its subsidiaries and the remaining 40 percent to its divisions.

The only insurance KIC provided during 1977 was that provided under the above-described reinsurance agreement it entered with National. In 1978, 1979, and 1980, KIC

1. The following table shows the differences between Kidde's payments to National and National's payments to KIC for 1977 and 1978.

| | 1977 | 1978 |
|---|---|---|
| Kidde's Payment to National | $11,624,819 | $13,671,100 |
| Payment for National's Retained Risk | 595,000 | 300,000 |
| Issuing Fee | 414,726 | 534,844 |
| Claims Services | 350,000 | 380,000 |
| Engineering Services | 105,000 | 90,000 |
| Taxes | 699,076 | 856,823 |
| Subtotal | 2,163,802 | 2,161,667 |
| National Payment to KIC | 9,461,017 | 11,509,433 |

had one additional insurance client, Theurer Atlantic, Inc., whose premiums constituted less than one percent of KIC's insurance premiums for each of those years.[2] KIC first actively sought third-party reinsurance business in 1980 and in connection with this effort capitalized $9 million of its retained earnings, bringing its total capital to $10 million. KIC's third-party business rose to 17 percent of KIC's total premium income in 1981, over 30 percent in 1982, and in excess of 50 percent in 1983, 1984, and 1985.

For tax years 1977 and 1978, Kidde filed federal income tax returns on a consolidated basis covering all of its divisions and wholly owned subsidiaries. In calculating its taxable income for these years, Kidde deducted from its gross income the entirety of its payments to National, including the full amount National ceded to KIC for reinsurance. The Internal Revenue Service (ORS) allowed Kidde a full deduction for the amount of Kidde's payments that National kept for itself (*i.e.,* did not cede to KIC). With respect to the premiums National ceded to KIC, the IRS allowed Kidde a deduction in the amount of the claims KIC actually paid to Kidde's divisions and subsidiaries plus the amount KIC accrued for liabilities for workers' compensation claims. The IRS disallowed the remaining $6,916,047 of Kidde's payments that National ceded to KIC for 1977 and $6,751,033 for 1978. The IRS's disallowance of these payments is the subject of Count II of the instant complaint.

## IV.

■ Pursuant to I.R.C. § 162(a), when calculating the amount of income taxes due, corporations may deduct from their income "all the ordinary and necessary [business] expenses." Pursuant to Treas. Reg. § 1.162–1(a), "insurance premiums" are considered an ordinary and necessary business expense. Hence, if the disputed payments to National are properly characterized as "insurance premiums," then these payments are fully deductible from Kidde's income. The IRS did not so categorize these payments and instead treated these payments, in effect, as constituting reserves that Kidde had set aside to pay future claims, *i.e.,* as a form of self insurance. Where a corporation reserves certain funds for the payment of future claims, the tax laws allow a deduction in a particular tax year only for the claims against that reserve that are actually paid or accrue in that year. *Anesthesia Service Medical Group, Inc. v. Commissioner,* 825 F.2d 241, 242 (9th Cir.1987).

Neither the Internal Revenue Code nor treasury regulations define the term "insurance," and the lack of a precise definition has resulted in extensive litigation concerning the proper tax treatment of payments made by parent corporations directly or indirectly to captive insurers. *See, e.g., Malone & Hyde, Inc. v. Commissioner,* 62 F.3d 835, 838 (6th Cir.1995); *Sears, Roebuck and Co. v. Commissioner,* 972 F.2d 858, 861–62 (7th Cir. 1992); *Gulf Oil Corp. v. Commissioner,* 914 F.2d 396, 411–12 (3rd Cir.1990); *Humana, Inc. v. Commissioner,* 881 F.2d 247, 251 (6th Cir.1989); *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297, 1300 (9th Cir. 1987); *Mobil Oil Corp. v. United States,* 8 Cl.Ct. 555, 564 (1985). In *Ocean Drilling & Exploration Co. v. United States,* 988 F.2d 1135, 1137 (Fed.Cir.1993), the Court of Appeals for the Federal Circuit, whose precedent is binding on this court, articulated its analysis for determining whether payments to a captive insurer "constitute[ ] true insurance premiums that are deductible as business expenses under section 162."[3] Unlike the instant case, where Kidde made its payments to a third-party insurer which in turn reinsured with Kidde's wholly owned subsidiary, *Ocean Drilling* involved the parent taxpayer making payments directly to its wholly owned captive insurer subsidiary. Therein, the substantive discussion of the deductibility

---

**2.** Prior to 1978, Theurer was a wholly owned Kidde subsidiary and participated in the National insurance program. After Kidde divested its interest in Theurer, KIC provided insurance directly to Theurer for which Theurer paid premiums of $100,000 for 1978 and 1979 and $90,000 for 1980.

**3.** The Federal Circuit appended the decision of the lower court and stated that it adopted the analysis therein as its own.

of insurance payments to captive insurers began with the overall guideline that the court "must adhere to the principles of [*Helvering v. Le Gierse,* 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941) and *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) ], in reaching a decision." In *Le Gierse,* the Supreme Court stated that "insurance involves risk-shifting and risk-distributing." 312 U.S. at 539, 61 S.Ct. at 649. *Moline Properties,* discusses the tax treatment of corporations and enunciates the general rule that absent an exception, such as where the arrangement is a "sham," a corporation should be viewed as "a separate taxable entity" from its shareholder. 319 U.S. at 438–39, 63 S.Ct. at 1133–34. Bringing together the requirements of *Le Gierse* and *Moline Properties,* the Federal Circuit in *Ocean Drilling* explained:

> Plaintiff and [its captive insurer] must be considered as separate entities in evaluating whether the transactions between the two companies resulted in risk shifting and risk distributing. However, if the business operations of [the captive insurer] are a sham, [the captive insurer's] "corporate form may be disregarded." *Moline Properties,* 319 U.S. at 439, 63 S.Ct. at 1134. Furthermore, even if plaintiff and [the captive insurer] are separate entities, if plaintiff retained the risk of the losses against which it insured, plaintiff's premiums amounted to a reserve for losses, and plaintiff would not be entitled to deduct such premiums from taxable income.

988 F.2d at 1150–51.

## V.

### A.

■ Defendant contends that plaintiff cannot prevail under the standard articulated in *Ocean Drilling* because during the tax years in issue, a binding indemnity agreement between Kidde and National was in effect pursuant to which Kidde retained the risk of losses with respect to the insurance policies that National had issued to Kidde. Plaintiff responds that although a document entitled "Indemnity Agreement" existed, the document never took effect.

The terms of the "Indemnity Agreement," if in effect, would, as defendant contends, have resulted in Kidde retaining the pertinent risks. Article I of the document lists the specific insurance policies that National would issue to Kidde and Articles II and III provide for indemnification as follows:

### ARTICLE II

> [Kidde] will indemnify [National] against all liability including but not limited to:
> (a) all losses
> (b) all loss expenses
> (c) all other expenses
> (d) all reserves
> that [National] may incur by reason of its issuance of the insurance policies listed in Article I hereof, or in defending or prosecuting any suit, action or other proceeding either in connection therewith, or in obtaining or attempting to obtain a release from liability in respect thereof.

> [Kidde] covenants that it will pay over to [National] all sums of money which [National] shall pay or become liable to pay by reason of the foregoing and will make such payment to [National] as soon as [National] shall make demand therefor.

### ARTICLE III

> [Kidde] undertakes to guarantee to [National] the payment of the amounts due under Article II hereof and will provide [National] the following:

> A clean irrevocable Letter of Credit acceptable to [National] in favor of [National] in the amount of one million U.S. dollars ($1,000,000).

Plaintiff does not dispute that the "Indemnity Agreement," if in effect, would place the ultimate risk of loss with Kidde. Plaintiff also acknowledges that Kidde officials signed and forwarded the indemnity agreement to National. Plaintiff argues, however, that the "Indemnity Agreement" was not in effect for all or at least part of the tax years in issue.

### B.

Plaintiff initially argues that Kidde officials revoked the offer contained in the "Indemni-

ty Agreement" before it was accepted by National and, in any event, that the parties never considered the "Indemnity Agreement" to be part of their business understanding. To support this argument, plaintiff notes that the parties did not find a signed copy of the "Indemnity Agreement" in their files. But the evidence submitted at trial, considered as a whole, weighs heavily to support a contrary conclusion that National representatives signed the "Indemnity Agreement" and returned the signed copies to Kidde, and that both parties considered the agreement to be an important part of their insurance relationship until they decided to void the agreement.

Kidde did not consider self insurance a viable option and was determined to have new insurance in effect on January 1, 1977, when its products liability insurance with Travelers' lapsed. National and Kidde, however, did not have sufficient time by that date to complete their negotiations with respect to the details of their insurance relationship. The "Indemnity Agreement," including the $1 million "Letter of Credit," enabled Kidde to convince National to issue the insurance policies prior to completion of these negotiations. The "Indemnity Agreement" assured National that it would be protected against loss until the parties could satisfactorily negotiate the details of their insurance relationship.

Indeed, even if there were no products liability crisis at the time Kidde approached National, National still would have had reason to be concerned about reinsuring with KIC a portion of its liability under the Kidde policies. KIC was newly created and had no experience in insurance. Perhaps most significantly, KIC was significantly undercapitalized by United States standards. Although KIC had premiums of $9 million in the first year, its initial capital was only $1 million, resulting in a premium-to-capital ratio of approximately 9:1. Insurance regulators within the United States generally insist on a premium-to-capital ratio of no more than 3:1.[4] Given this undercapitalization,[5] it is not surprising, and indeed to be expected, that before issuing the insurance to Kidde, National would have insisted that Kidde provide some additional security with respect to KIC's performance under the KIC–National reinsurance agreement. The "Indemnity Agreement" provided such security by permitting National to terminate the insurance arrangement without suffering any possible loss in the event the parties were unable to negotiate satisfactorily the details of their insurance relationship. In this regard, the crucial nature of the signed "Indemnity Agreement" to National was underscored by the testimony of Robert King, who had primary responsibility within AIG for establishing the National–Kidde insurance relationship. King testified that the "Indemnity Agreement" provided National the "level of comfort" it needed to issue the Kidde insurance policies at a time when KIC was not in a position itself to assume the risk in a manner satisfactory to AIG.

### C.

After January 1, 1977, National and Kidde had ongoing negotiations, for a substantial period of time, concerning the remaining details of their insurance relationship. In April 1977, National and KIC entered into "facultative reinsurance agreements" pursuant to which KIC reinsured a portion of the risks National had insured for Kidde. Plaintiff argues that assuming the "Indemnity Agreement" was in fact executed, the agreement nevertheless was intended only to protect National on a temporary or interim basis until KIC was ready to begin business. Hence, plaintiff argues, if the "Indemnity Agreement" ever went into effect, Kidde and National intended it to be superseded when National and KIC entered the "facultative insurance agreements" in April 1977.

---

**4.** Plaintiff argues that KIC's initial capital exceeded the minimum required in Bermuda. But satisfying Bermuda standards does not mean that a reinsurer such as National seeking to share risk would have considered such capitalization to be adequate. Indeed, KIC's capitalization was below the ratio followed by some other Bermuda captive insurers and was below the minimum requirement adopted into Bermuda law in 1980.

**5.** Indeed, KIC's $1 million capitalization was equal to its potential liability for a single automobile or general liability claim against Kidde.

The court agrees that National and Kidde reasonably could not have viewed the "Indemnity Agreement" as a long-term commitment. National and Kidde intended to establish an insurance relationship and, by holding Kidde ultimately responsible for any losses National suffered, the "Indemnity Agreement" was fundamentally inconsistent with the existence of any true insurance relationship. But, although the April 1977 "facultative reinsurance agreements" set forth some terms between the parties, they did not address National's concerns about KIC's undercapitalized status. These agreements did not offer National any security, beyond KIC's assets, to ensure that KIC would fulfill its reinsurance obligations thereunder. Thus, in an effort to address this concern, National and Kidde continued negotiations after National and KIC entered the "facultative reinsurance agreements." During the course of these often adversarial negotiations, National continually requested that Kidde provide a parental guarantee pursuant to which Kidde would guarantee KIC's obligations under the reinsurance agreement. Replacing the "Indemnity Agreement" with such a parental guarantee would change the parties' legal relationship in that the "Indemnity Agreement" did not include KIC and under that agreement, Kidde's obligation to cover National's losses was not limited to the reinsurance aspect of the National–Kidde insurance policy.

Upon first impression, it seems unusual for an insurance arrangement to be in place for such a long period of time without the parties having worked out the final details of their insurance relationship. But at trial, plaintiff's witnesses explained that it was typical in the insurance industry for insurance to be issued with an understanding by both parties that the precise terms would later be determined through good faith negotiations. In this case, the continued existence of the "Indemnity Agreement" gave National leverage to ensure that Kidde would continue to negotiate in good faith. Indicative of the continued existence of the signed "Indemnity Agreement" and the leverage it provided National is a September 27, 1977, letter from Robert King to a representative of Kidde's insurance broker, Fred S. James and Company, which states: "We still hold the objectionable Indemnity Agreement for which Fred. S. James and Kidde diligently described as a thorn in the side."

### D.

Ultimately, National agreed to void and return the signed "Indemnity Agreement" to Kidde because National became convinced that KIC's financial status and the "facultative reinsurance agreements" and letters of credit received from KIC were sufficient to support a standard insurer-reinsurer relationship. The court cannot, however, determine from the record the precise date on which the parties agreed that the signed "Indemnity Agreement" no longer would be in effect. Defendant argues that because plaintiff bears the burden of proof, the absence of clarity in the record as to the precise date on which the agreement was voided requires that plaintiff's claim fail. But the trial record, taken as a whole, supports a finding that by at least June 1, 1978, the parties had agreed that the "Indemnity Agreement" no longer would control.

KIC's gain of experience in the reinsurance business apparently resulted in an increase in KIC's net assets during 1977 and 1978. As a result, on or about May 3, 1978, National decided no longer to pursue a parental guarantee from Kidde. National decided instead that it would be satisfied if KIC provided a letter of credit from a major United States bank. This determination by National is crucial. Having decided that a letter of credit from KIC would be adequate to protect National's financial interests, it would follow that it was neither necessary nor reasonable for National to maintain the "Indemnity Agreement" in force. As explained above, the parties did not view the "Indemnity Agreement" as a long-term agreement but rather only as controlling until the parties completed negotiations as to the details of their insurance relationship. Once National became convinced that KIC's assets combined with the letter of credit from a major United States bank were sufficient to ensure that KIC would perform its obligations, National was beyond the point that it needed the "level of comfort" to which

King referred at trial. Hence, at this point in time, the purpose behind the "Indemnity Agreement" ceased to exist. Because National and Kidde were interested in a long-term insurance relationship, it is reasonable to conclude that upon deciding that KIC's assets and letter of credit were sufficient to protect its financial interests, National would have proceeded in due course to remove the "thorn" from Kidde's side and render the "Indemnity Agreement" void. The court concludes that National would have returned the signed "Indemnity Agreement" and rendered it void by at least June 1, 1978.

Hence, for tax year 1977 and tax year 1978 up through May 31, Kidde retained the risk of losses with respect to the insurance policies that National had issued to Kidde. Thus, under *Ocean Drilling*, Kidde's payments to National that National ceded to KIC during these periods amounted to reserves for future claims and Kidde is not entitled to deduct that amount from its taxable income.

### VI.

The next issue to address is the tax treatment of the disputed payments to National between June 1 and December 31, 1978. As described above, if the payments are properly characterized as "insurance premiums" under Treas. Reg. § 1.162–1(a), then these payments are properly deductible from Kidde's income.

### A.

The court will begin its analysis with a discussion of the Supreme Court's decision in *Moline Properties*. In *Moline Properties*, a corporation sold real property that it owned and the sole stockholder of the corporation sought to treat the gains from that sale as income taxable to the stockholder rather than to the corporation, *i.e.*, to ignore the corporate existence as a mere fiction. The Supreme Court refused to treat the gains as individual income and instead insisted that the corporation be considered a distinct entity notwithstanding the fact that the shareholder owned 100 percent of the corporation's stock. The Court explained:

The doctrine of corporate entity fulfills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creditor's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. . . .

To this rule there are recognized exceptions. A particular legislative purpose . . . may call for the disregarding of the separate entity, as may the necessity of striking down frauds on the tax statute. In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations, the form is a bald and mischievous fiction.

319 U.S. at 438–39, 63 S.Ct. at 1134 (citations omitted) (footnotes omitted).

As the court in *Ocean Drilling* suggested, *Moline Properties* has been an important focus in court decisions addressing the tax treatment of purported insurance premiums paid to captive insurers. This is so because *Moline Properties* generally requires that the captive insurer not be treated as the alter ego of its parent but rather as a distinct taxable corporate entity.

Consistent with *Moline Properties*, when applying the tax laws to captive insurers, courts initially have sought to determine whether the arrangement among the captive insurer, the parent, and any third-party companies should be classified as a "sham." If the court determines that the corporate arrangement is a sham, then the inquiry ends and the payments to the captive insurer are treated as nondeductible reserves rather than "insurance premiums." Next, either as part of this analysis of whether a sham exists, or as part of a separate analysis of whether the payments to the captive insurer otherwise should be characterized as "insurance premiums," courts have analyzed whether the arrangement among the parties is consistent with commonly accepted notions of insurance. If the arrangement is not consistent with commonly accepted notions of

insurance, then the payments are not deductible from income.[6] Finally, assuming the arrangement is not a sham and is otherwise consistent with commonly accepted notions of insurance, courts generally have proceeded to apply the definition of "insurance" provided in *Le Gierse* and determine whether risk shifting and risk distributing are present.

### B.

■ Turning to the sham exception in *Moline Properties,* the totality of the evidence indicates that Kidde's creation of KIC was not a sham and that Kidde had legitimate business reasons for creating a captive insurer subsidiary that had nothing to do with the tax advantages that would result from paying insurance premiums rather than self insurance. First, in order to conduct business in the over 40 states in which Kidde's divisions and subsidiaries operated, Kidde was required to possess certificates of insurance as evidence of primary casualty coverage. Apparently, Kidde potentially could have satisfied this requirement through self insurance, but setting up such a program to satisfy state requirements would have taken more time than Kidde had available before its Travelers policy expired. Second, securing insurance from National rather than self insurance enabled Kidde to maintain existing prices and policies for catastrophic insurance. Kidde had in effect catastrophic insurance with third-party insurers which covered claim amounts above the limits contained in the Travelers policy of up to $400 million per claim. Apparently, writers of catastrophic insurance required that the amount of the claims that fall below the catastrophic level be covered under a separate insurance policy. This would ensure that another established insurance company would be analyzing and seeking to uncover deficiencies in any claim for which the catastrophic insurer may be liable. Finally, creating a captive insurer furthered the aim of Kidde to form an insurance subsidiary that would provide insurance or reinsurance to unrelated third parties and

serve as a separate profit center for Kidde. The fact that KIC moved fairly quickly into reinsurance with third parties supports the conclusion that when Kidde established KIC, or at least by June 1, 1978, Kidde had hoped one day to operate KIC as an insurance subsidiary that ultimately would have third-party clients. As described above, after 1980, KIC began writing a significant amount of insurance for unrelated third parties.

One factor courts have considered in determining whether a sham exists is the capitalization and financial condition of the captive insurer. *See Malone,* 62 F.3d at 839. As described above, during the period at issue here, between June 1 and December 31, 1978, KIC's total financial position was adequate to fulfill KIC's obligations under its agreement with National. The best evidence of the adequacy of KIC's overall financial position is that without any parental guarantee or other distinct financial support from Kidde, National was willing to reinsure with KIC claims on which National was primarily liable.

### C.

■ Next, the court will turn to the question of whether the arrangement among KIC, Kidde, and National is consistent with commonly accepted notions of insurance. Based on the record as a whole, the court concludes that the arrangement is sufficiently consistent so as not to disqualify the disputed payments to National from being treated as "insurance premiums."

The written agreements between Kidde and National, and National and KIC are fully consistent with commonly accepted notions of insurance in that each allocates a risk, *i.e.,* the risk that in the future one of the parties to the agreement will face uncertain and variable claims against it. In the Kidde–National agreement, Kidde agreed to pay National a specified premium and National in turn agreed to assume the risk with respect to undetermined future claims against Kidde.

6. Such a conclusion does not mean that an interrelationship among the parties is irrelevant to this analysis. The fundamental issue in captive insurance cases is whether payments to the captive insurer should be classified as "insurance premiums" and whether the ownership relationship among the corporations involved has been relevant to this analysis, particularly, as explained below, when assessing whether risk shifting and risk distributing are present.

In the National–KIC "facultative reinsurance agreements," National agreed to pay KIC a specified premium and KIC in turn agreed to assume primary responsibility for certain future claims against Kidde over which National had assumed responsibility in the Kidde–National agreement. The respective premiums set out in these agreements apparently were generally established through means typically used in the insurance industry, which are based primarily on predictions as to the amount of future claims.

The Kidde–National–KIC arrangement also conforms to commonly accepted notions of insurance when viewed from the perspective of a claimant presenting a claim against Kidde. KIC contracted with National to accept, process, evaluate, and pay certain claims against Kidde. Those filing claims against Kidde apparently interacted with KIC representatives in essentially the same way as claimants interact with representatives of any other reinsurance company. Defendant's contention that the Kidde–National–KIC arrangement is inconsistent with commonly accepted notions of insurance does not focus on the wording of the respective agreements, the methods of establishing premiums, or the presentation of claims by claimants. Rather, defendant focuses on the organization of KIC and certain other aspects of its operation.

Defendant's argument that the organization and operation of KIC is inconsistent with commonly accepted notions of insurance focuses on KIC's incorporation in Bermuda, the control Kidde exercised over KIC, and the comparatively small amount of traditional insurance functions KIC performed. As to incorporation in Bermuda, Kidde chose to incorporate KIC in Bermuda in part because Bermuda has far less regulation of insurance companies than the United States. Indeed, after its incorporation, KIC intentionally sought to avoid United States regulation. KIC never applied for business in the United States and the president of KIC, who was also the risk manager at Kidde, traveled to Bermuda from his United States office to sign pertinent documents. As to Kidde's control over KIC, the officers of KIC were primarily officers of Kidde, and these officers controlled KIC's activities, including the investment of funds. Next, as to the functions KIC performed, defendant argues that KIC was virtually an invisible company which existed primarily on paper. KIC had minimal contacts in Bermuda. It had no employees and no separate offices in Bermuda and operated in Bermuda through a management company specializing in managing captive insurance companies. The management company prepared a limited amount of documents annually for KIC. KIC contracted with third parties, primarily companies related to AIG, for most of the typical functions performed by insurance companies, including, as noted above, the processing of insurance claims.

Clearly, KIC's organization and certain aspects of its operation are different than many United States insurance companies. It is not apparent, however, that these differences, by themselves, should render nondeductible payments that otherwise would be classified as deductible insurance premiums. With respect to KIC's incorporation in Bermuda, any corporation, including insurance corporations, generally can be expected to base its decision as to where to incorporate and where to locate its employees on a determination as to which choices will result in maximum profits for the corporation. Hence, an insurance corporation's decision to incorporate in Bermuda because of a more favorable regulatory environment and to locate its employees elsewhere would not be inherently inconsistent with commonly accepted notions of insurance. Indeed, courts, including the Federal Circuit in *Ocean Drilling*, have allowed deductions for payments to captive insurers incorporated in Bermuda.

As to Kidde's control over KIC, staffing KIC with Kidde employees suggests that Kidde not only wanted to take advantage of the expertise of its own employees in overseeing KIC's operation but also wanted to keep firm control over KIC's day-to-day operations. But assuming that such a close relationship between the insured and insurer is relatively rare, Kidde's aims would not be inherently inconsistent with KIC creating what amounts to a traditional insurer-insured relationship with respect to future claims

against Kidde. As to KIC "contracting out" most typical insurance functions, it would not seem unreasonable for KIC to do so when KIC first entered the insurance business. Through such contracts, a new entrant into the industry could eliminate uncertainty as to the cost of performing certain services and thereby secure greater predictability as to its operational costs.

### D.

The court will now address perhaps the most difficult area of the inquiry—application of the reference in *Le Gierse* to insurance being characterized by risk shifting and risk distributing. The risk to which *Le Gierse* refers is the risk that in the future a corporation will face uncertain and variable claims against it. *See Ocean Drilling*, 988 F.2d at 1151; *Sears, Roebuck*, 972 F.2d at 862. Risk shifting involves the transfer of that risk from the insured to the insurer. In exchange for the insured paying a specified premium, the insurer agrees to process and pay all claims against the insured that are covered under the insurance policy. Hence, in effect, the insured shifts the risk to the insurer that the total amount of the claims against it (including the costs of processing) will exceed the premium paid.

Insurance companies have expertise in estimating and administering claims and seek to set the premiums charged so as to reflect the expected losses that will result from future claims. Although insurance companies may be able to predict such costs with reasonable accuracy over extended periods of time, for shorter periods, such as year to year, the total cost of these claims will vary from the expectation, *i.e.*, vary from the average. In some years the total cost of claims may exceed the expected amount, *i.e.*, the average yearly cost calculated over a longer period of time, and in other years the costs may be less than the expected amount. Thus, by agreeing to provide insurance for a fixed premium for a particular year, the insurer assumes the risk that the total cost of claims for that year will exceed the expected amount. *See Ocean Drilling*, 988 F.2d at 1151.

Risk distribution addresses this risk that over a shorter period of time claims will vary from the average. Risk distribution occurs when particular risks are combined in a pool with other, independently insured risks. By increasing the total number of independent, randomly occurring risks that a corporation faces (*i.e.*, by placing risks into a larger pool), the corporation benefits from the mathematical concept of the law of large numbers in that the ratio of actual to expected losses tends to approach one. In other words, through risk distribution, insurance companies gain greater confidence that for any particular short-term period, the total amount of claims paid will correlate with the expected cost of those claims and hence correlate with the total amount of premiums collected.

In concluding that risk shifting and risk distributing were present in *Ocean Drilling*, the court relied upon a factor not present in the instant case—the captive insurer issued insurance to unrelated third parties during the tax years in issue. With respect to risk shifting, the court concluded that "[u]nrelated business operated to reduce the amount of risk to which [the insurer] was exposed." *Id.* at 1152. With respect to risk distribution, the court stated: "Risk distribution involves spreading the risk of loss among policyholders. [The captive insurer] had unrelated business of approximately 44 and 66 percent for the two years at issue. This amount of unrelated business sufficiently spreads risk so as to constitute risk distribution." *Id.*

### E.

Given the decision in *Ocean Drilling*, the issue presented herein is whether the disputed payments to National can be classified as "insurance premiums" notwithstanding KIC's lack of significant unrelated business. *Humana*, 881 F.2d 247, involved a fact situation in many ways similar to the instant action. Humana, like Kidde, was a large corporation that operated a variety of businesses, some within the parent corporation and others through wholly owned subsidiaries. Humana created a captive insurance subsidiary and purchased insurance from that captive insurer covering future claims against itself and

its wholly owned, separately incorporated subsidiaries. Like Kidde, Humana allocated the total premiums among its subsidiaries according to the risk each subsidiary posed.

In determining the deductibility of the disputed payments in *Humana*, the Court of Appeals for the Sixth Circuit distinguished between the payments that covered future claims against Humana's own operations and the payments that covered future claims against the operations of Humana's separately incorporated subsidiaries. The court allowed a deduction for the payments covering claims against the subsidiaries, but not the payments covering claims against the businesses that Humana operated within its own corporate structure. In denying a deduction for the payments that related to the captive insurer assuming responsibility for future claims against the parent corporation, the Sixth Circuit, citing *Clougherty*, 811 F.2d 1297, concluded that the agreements did not produce any risk shifting and amounted to no more than Humana setting aside a reserve for future claims against it. In concluding that no risk shifting occurred, the court focused on the parent's assets and concluded that there was no net change in the value of the parent's assets when the captive insurer assumed responsibility to pay future claims against the parent. The court explained:

> The economic reality of insurance between a parent and a captive insurance company is that the captive's stock is shown as an asset on the parent's balance sheet. If the parent suffers an insured loss which the captive has to pay, the assets of the captive will be depleted by the amount of the payment. This will reduce the value of the captive's shares as an asset of the parent. In effect, the assets of the parent bear the true economic impact of the loss.

*Humana*, 881 F.2d at 253. Because Humana suffered the full economic impact of a payment of a claim by its wholly owned captive insurer subsidiary, the court reasoned that the arrangement did not result in the parent divesting itself of any risk, and hence no risk shifting occurred and no insurance existed under the requirements of *Le Gierse*.

If the Sixth Circuit had maintained this narrow focus on the net assets of Humana when it evaluated the payments to the captive insurer relating to future claims against Humana's wholly owned subsidiaries, then the court also would have concluded that these payments should not be classified as "insurance premiums." Because Humana owned 100 percent of these separately incorporated subsidiaries, Humana's net assets would not be affected by a contractual arrangement pursuant to which one of its wholly owned subsidiaries agreed to pay future claims against another wholly owned subsidiary. For example, a $1,000 payment on a claim against one of its subsidiaries would result in a $1,000 decrease in Humana's net assets regardless of which subsidiary paid the claim. Thus, when viewed from the perspective of Humana, the various contractual arrangements did not produce any shifting of risk away from Humana. Humana would face essentially the same risk before and after entry of the contracts rendering the captive insurer responsible for future claims against the wholly owned subsidiaries.

The Sixth Circuit, however, did not maintain this narrow focus on Humana's net assets when determining the deductibility of payments covering future claims against the wholly owned subsidiaries. Rather, the court interpreted *Moline Properties* as precluding a focus on the parent corporation when evaluating the tax status of payments by the wholly owned subsidiaries because such a focus would improperly treat the various distinct corporations as a single economic unit. The court interpreted *Moline Properties* to require, when assessing whether risk shifting and risk distributing is present, a focus on the net assets of the distinct corporation that is purchasing the protection rather than the parent. The court explained:

> The economic reality, however, of insurance between the Humana subsidiaries and [Humana's captive insurer], where the subsidiaries own no stock in the captive and vice versa, is that when a loss occurs and is paid by [the captive insurer] the net worth of the Humana affiliates is not reduced accordingly. The subsidiaries' balance sheets and net worth are not affected by the payment of an insured claim by [the captive insurer]. In reality, therefore,

when the Humana subsidiaries pay their own premiums under their own insurance contracts, as the facts show, they shift their risk to [the captive insurer].

*Id.*

### F.

Herein, both parties argue that this court should reject the split result in *Humana.* Defendant argues that the court should deny an "insurance premium" deduction both for the payments covering the subsidiaries that are separately incorporated as well as the payments for the divisions that operate within Kidde's own corporate structure. Plaintiff argues that both types of payments should qualify for an "insurance premium" deduction.

Defendant's argument relies in part upon the testimony of defendant's expert, Professor Gregory Niehaus. Professor Niehaus testified in effect that modern economic theory views a corporation as a nexus of contracts among individual stakeholders and evaluates corporate decisions based on how the individual stakeholders are affected. Consistent with this approach, Professor Niehaus argued that corporations do not bear risk but rather individual stakeholders bear risk. Hence, defendant argues, in determining whether risk shifting or risk distributing occurred herein, the court should focus on the individual shareholders of Kidde, and the risk faced by these shareholders is not affected when one subsidiary assumes legal responsibility for the claims against the other subsidiaries.

Professor Niehaus' position, to the extent it presents a purely economic analysis, is straightforward and makes eminent sense. The modern theory of the corporation which looks at corporations as fictional entities, provides an excellent analytic framework in which to evaluate the economic effects of a corporate action.[7] Corporations are owned by their shareholders and from the shareholders' perspective herein, the insurance ar-

rangement did not result in the shareholders securing the benefits of risk shifting or risk distribution. Because the shareholders in effect own 100 percent of Kidde, KIC, and each of Kidde's other wholly owned subsidiaries, the shareholders' financial position would be the same whether, for example, a $1,000 claim is paid by Kidde, KIC, or some other wholly owned Kidde subsidiary. Hence, shifting responsibility for claims to different points within the overall Kidde structure would not shift any risk away from the shareholders or distribute any risk the shareholders face to a larger pool.

■ A problem with Professor Niehaus' argument, however, arises in the transition from abstract economic theory to application of existing tax laws and case precedent. Contrary to the modern theory of corporations, the tax laws do not view corporate actions from the perspective of the corporate shareholders and do not treat corporations as fictitious entities that can be ignored. Instead, the tax laws treat corporations as distinct and substantive legal entities which are taxed separate and apart from the entities that own them. *"Moline Properties* stands for the proposition that a parent corporation and its subsidiary corporation be accorded treatment as separate taxable entities." *Ocean Drilling,* 988 F.2d at 1144. Indeed, in *Moline Properties,* the Supreme Court specifically rejected the taxpayer's request, in effect, to treat the corporation as a fiction and to treat the assets owned by the corporation as though they were owned by the corporate shareholder. The teaching of *Moline Properties* in effect is that the incorporation of a business brings with it certain benefits and certain burdens and once the business is incorporated, the benefits accrue and the burdens must be borne. *See Moline Properties,* 319 U.S. at 438–39, 63 S.Ct. at 1133–34.

■ Hence, for purposes of assessing income taxes, *Moline Properties* requires

---

**7.** Defendant relies upon the following statement of the theory:

> Stripped to its essentials, the corporation is simply a legal fiction which serves as a nexus of contracts. Individuals and organizations— employees (including managers), investors, suppliers, customers—contract with each other in the name of a financial entity, the corporation.

William H. Meckling and Michael C. Jensen, *Reflections on the Corporation as a Social Invention,* J. Applied Corp. Fin. 9.

this court to treat Kidde and its separately incorporated subsidiaries as distinct from one another as well as distinct from Kidde shareholders. When these separately incorporated subsidiaries are so treated, the contractual arrangement pursuant to which KIC assumed responsibility for the subsidiaries' future claims would involve the shifting of risk away from these subsidiaries in the same way as if the subsidiaries secured insurance from an independent third-party insurer. As explained in *Humana*, 881 F.2d at 253, the wholly owned subsidiaries have no ownership interest in the parent's captive insurer and hence would not suffer any additional loss if payments by the captive insurer of future claims against the subsidiaries exceeded the amount of premiums the captive insurer received. For example, because a $1,000 claim against a Kidde subsidiary paid by KIC would not result in a corresponding decrease in that subsidiary's net worth, the risk as to that claim was shifted from the subsidiary, through National, to KIC. Similarly, when viewed from the perspective of that subsidiary, risk distribution also took place in that KIC distributed the risk faced by that subsidiary in a pool with the risks of other entities in which the subsidiary did not have an ownership interest. Because risk shifting and risk distributing are present, consistent with *Le Gierse, Moline Properties,* and *Humana,* Kidde's payments to National covering future claims against its wholly owned subsidiaries are properly treated as "insurance premiums."[8]

### G.

This brings the court to the issue of the tax treatment of the payments Kidde made to National covering future claims against the divisions that operate within Kidde's own corporate structure. Plaintiff does not dispute that Kidde's divisions would suffer a dollar-for-dollar loss in net asset value for every dollar KIC paid on a claim against Kidde. Relying in part upon the testimony of and a report co-authored by its expert Dr. Michael Powers, however, plaintiff contends that this court's determination that the payments covering future claims against Kidde's wholly owned subsidiaries are deductible as "insurance premiums" dictates that the court also treat in the same way the payments pertaining to future claims against the divisions that operate within Kidde's structure and not as separate corporate subsidiaries. Plaintiff argues that the court should view the crucial issue to be whether the operation of KIC is properly characterized as the equivalent of a self-insurance reserve for Kidde or rather as a separate viable entity, financially capable of meeting its insurance obligations. Plaintiff then argues that the fact that distinct corporate entities accounted for approximately 60 percent of KIC's business during the tax years in issue is itself sufficient to show that KIC was operating as a viable insurance company and that it is not relevant that these entities were wholly owned subsidiaries of Kidde. In a related argument, plaintiff contends that because the wholly owned subsidiaries had the option to select other insurers, KIC was subject to market forces in its pricing and thus was operating like a traditional insurance company rather than simply as a loss reserve for Kidde.

The problem with plaintiff's argument is that it ignores *Ocean Drilling's* interpretation of *Le Gierse* as requiring risk shifting and risk distributing for payments to be classified as "insurance premiums." ("[E]ven if plaintiff and [the captive insurer] are separate entities, if plaintiff retained the risk of the losses against which it insured, plaintiff's premiums amounted to a reserve for losses, and plaintiff would not be entitled to deduct such premiums from taxable income." 988 F.2d at 1150–51.) With respect to risk shifting and risk distribution, as generally noted

---

8. In its post-trial brief, defendant presents the alternative argument that the court need not focus on the shareholders' interests to conclude that no risk shifting occurred, but rather could focus on Kidde's interests. By focusing on the parent's interests to determine whether payments by a wholly owned subsidiary involve risk shifting, defendant's argument is substantially identical to the economic family argument rejected in *Humana,* 881 F.2d at 252. As with the modern theory of the corporation, the economic family argument has appeal as a general theory for evaluating economic effects but fails to recognize the legal significance of incorporation in the manner required by *Moline Properties.*

above, the Federal Circuit in *Ocean Drilling* defined the relevant risk that is transferred in an insurance relationship as the "variability of loss," *i.e.*, the risk that the amount of the loss suffered will exceed the average or expected amount of loss. *Id.* at 1151–52. The court then explained the relationship between risk shifting and risk distribution as follows:

> Unrelated business operated to reduce the amount of risk to which plaintiff was exposed. When plaintiff purchased insurance from [its captive insurer], plaintiff transferred to [the captive] a certain level of risk or a certain amount of variability of loss. Because [the captive insurer] had unrelated business, this level of risk was not retained by plaintiff, the parent.... The considerable amount of unrelated business, approximately 44 and 66 percent during the years in issue, caused a significant reduction in risk. Plaintiff as the parent ... thus shouldered a level of risk significantly lower than the level of risk that it initially transferred to [the captive insurer]. Consequently, the risk transferred to [the captive] and the risk ultimately borne by plaintiff were not the same, and plaintiff's premiums constituted the transfer of risk.

> If the level of risk plaintiff initially had transferred and the level of risk plaintiff ultimately had shouldered were virtually the same, plaintiff's risk effectively would not have transferred.

> \* \* \* \* \* \*

> Since risk shifting was present, the next question to be addressed is whether risk distribution occurred. Risk distribution involves spreading the risk of loss among policyholders. [The captive insurer] had unrelated business of approximately 44 and 66 percent for the two years at issue. This amount of unrelated business sufficiently spreads risk so as to constitute risk distribution.

*Id.* at 1152–53.

Hence, the Federal Circuit determined that risk shifting cannot be established simply by showing that the captive insurer was a separate corporation that was legally responsible for claims against the parent. Rather, the court distinguished between two concepts—the level of risk transferred to the captive insurer and the level of risk ultimately shouldered by the parent. If the risk ultimately shouldered by the parent is less than the risk transferred, then the required risk shifting occurred. If the two levels of risk are the same, however, then no risk shifting occurred even though the captive insurer has become legally responsible for the parent's claims. The Federal Circuit rested its position that the parent shifted risk, *i.e.*, shifted the variability of loss, on its conclusion that "[b]ecause [the captive insurer] had unrelated business, [the] level of risk [transferred] was not retained by ... the parent." *Id.* at 1152.

In *Ocean Drilling*, for example, a $1,000 claim against the parent paid by the captive insurer would result in a $1,000 decrease in the parent's net assets whether or not the captive insurer also offered insurance to unrelated corporations. The question then becomes how this unrelated business operates to change the variability of loss faced by the parent. The Federal Circuit's answer appears to lie in the parent, through the arrangement involving the captive insurer, placing the risks faced by the parent into a pool with other independently insured risks. As explained above, pursuant to the mathematical law of large numbers, the variability of loss decreases when risks are combined with other independent risks. Hence, from the parent's perspective, when risks faced by the parent become the responsibility of a wholly owned subsidiary, and the subsidiary in turn combines those risks with other independent risks of corporations unrelated to the parent, the net effect is that the parent will shoulder less risk because it has a lower variability of loss than it faced before it entered the arrangement with its subsidiary.

■ There is no analogous decrease in risk where, as in the instant case, the risks combined by the captive insurer involve essentially only future claims against the parent and its wholly owned subsidiaries. Because the parent owns the subsidiary corporations, its net assets, as reflected on its balance sheet, would

decrease dollar for dollar with any loss suffered by any one of those subsidiaries. Hence, herein, prior to entering the agreement that led to KIC assuming responsibility for future claims against Kidde's divisions and subsidiaries, Kidde's risk profile, *i.e.*, the risks that Kidde potentially shouldered, included all claims against itself or any of its wholly owned subsidiaries. Kidde's risk profile did not change after KIC became responsible for these claims. Kidde's net assets would still decrease dollar for dollar with any payment made by KIC and Kidde would not benefit from any decrease in its variability of loss because Kidde did not combine its risk with substantial risks of unrelated business.

Thus, when viewed from the perspective of the parent, when its captive insurer combines the risks of the parent and/or its wholly owned subsidiaries with sufficient unrelated risks from unrelated corporations, the net effect is to decrease the variability of loss and hence, under the analysis of *Ocean Drilling*, to accomplish some shifting of risk. On the other hand, if the only risks in the pool are essentially those of the parent and its wholly owned subsidiaries, the parent has not changed the variability of loss it faces and hence has not shifted any risk.

This court acknowledges that at first blush it appears inconsistent to classify payments made by Kidde's wholly owned subsidiaries as "insurance premiums" and not to classify payments made by Kidde's divisions in the same way when KIC appears to have provided the same services to both. But as interpreted in *Ocean Drilling*, *Le Gierse* requires risk shifting and risk distributing for a relationship to involve insurance. Because, as explained above, Kidde did not shift any risk to KIC, the premiums it paid amounted merely to a reserve fund to pay future claims. The wholly owned subsidiaries, on the other hand, did shift risk to KIC. Thus, although viewing the arrangement from KIC's perspective may suggest that KIC was performing the same functions for Kidde and its subsidiaries, when viewed from the perspectives of Kidde and the other subsidiaries, the entities whose tax responsibility is under

inquiry here, KIC was not performing the same functions. The subsidiaries were utilizing KIC to shift risk but Kidde was not.

This split result also is consistent with *Moline Properties*. *Moline Properties* requires the court to treat each corporation as a distinct taxable entity. This court achieves that end by making tax determinations based on the perspective of the corporations involved. As described above, from Kidde's perspective, the purported insurance relationship between Kidde and KIC covering Kidde's divisions did not produce risk shifting or risk distribution. From the perspective of the separately incorporated subsidiaries, their payments did produce risk shifting and risk distribution.

### H.

Next, plaintiff presents two alternative arguments to support its position that Kidde achieved risk shifting and risk distribution. First, plaintiff notes that unlike the parent in *Humana*, Kidde made its payments to an independent third-party insurer, National, rather than. to its captive insurer. This difference is compelling, plaintiff argues, because if Kidde transferred responsibility for future claims to National rather than KIC, then risk shifting occurred because National was a separate corporation in which Kidde had no ownership interest.

As generally described above, however, National's willingness to provide insurance to Kidde and its subsidiaries was conditioned upon National reinsuring a portion of that liability with KIC. From the beginning, the parties understood that KIC, rather than National, would be responsible for these claims and that Kidde's payments relating to such coverage would be ceded to KIC. In this regard, as described above, by June 1, 1978, both parties were convinced that KIC's assets were sufficient to provide such coverage without a parental guarantee. In addition, the IRS, in effect, considered the extent to which National maintained ultimate liability for the claims when it determined the amount of Kidde's payments that would be classified as insurance premiums. When determining the appropriate amount to cede to KIC for reinsurance, National would have

factored into its calculations any possibility that KIC would not be able to meet its contractual burdens and would have withheld, *i.e.*, not ceded, an appropriate amount to account for that risk. Because the entire amount of Kidde's payments that National retained were classified as insurance premiums, Kidde did receive a deduction for payments that correspond to National's maintaining ultimate responsibility for future claims.

Plaintiff's final argument rests on KIC having entered into reinsurance agreements subsequent to 1980 with third parties not related to Kidde. Plaintiff contends that it was predictable during the period in issue here that certain claims against Kidde that arose during that time would not have been reported and paid until 1981 or thereafter. For such claims, plaintiff argues, risk shifting and risk distribution are present because by the time the claims were resolved, KIC had entered reinsurance agreements with unrelated third parties and hence those claims ultimately were pooled with claims against unrelated corporations. But assuming that the pooling of claims in later years can be used to demonstrate the required risk shifting and risk distributing in earlier years, plaintiff has failed to demonstrate the precise amount of those claims that remained unresolved after 1980. Hence, plaintiff has not established that any risk shifting that did occur in later years was sufficient to warrant classifying all or any specific portion of the payments in issue as insurance premiums. In any event, it would not be appropriate, when assessing whether the payments in issue involved risk shifting and risk distributing, to rely upon third parties that purchased reinsurance from KIC for the first time after 1980. Assuming that it was apparent in 1978 that certain claims against Kidde would remain unresolved in 1980, it was not similarly predictable that by 1981 or any time thereafter KIC would enter into significant insurance relationships with unrelated third parties. Hence, it was not possible at the close of tax year 1978 to conclude that Kidde's arrangement covering claims arising during that year would shift and distribute risk to any significant extent.

## VII.

### A.

Turning next to the issue of WIN credits, in Count IV of its amended complaint, plaintiff seeks refunds for tax years 1977 and 1978 based on the WIN tax credit program Congress designed to encourage private firms to offer employment to individuals receiving public assistance. The WIN program granted employers tax credits to defray some of the employment expenses during the first two years of the eligible individuals' employment. *See* I.R.C. §§ 50A and B (1954). To be eligible for the tax credit, the WIN program required an employer to secure from an appropriate federal, state, or local agency a certification that, at the time the employee was hired, the employee had been receiving public assistance or was in a work incentive program. I.R.C. § 50B(h)(1)(A). As originally drafted, the controlling statute did not specifically address the timing of the certification, *i.e.*, whether the employer had to obtain the certification prior to hiring the employee. *Id.*

In 1981, Congress enacted the Economic Recovery Tax Act of 1981 (the ERTA), Pub.L. No. 97–34, § 261, 95 Stat. 172, which, effective for tax years beginning after December 31, 1981, merged the WIN tax credit program into the "targeted jobs" tax credit provision set forth in I.R.C. § 51. The ERTA allowed tax credits for hiring members of certain targeted groups of economically disadvantaged individuals, including those in the WIN program. The ERTA maintained the requirement of a certification but clarified the timing requirement for such certification. An employer could receive a tax credit for hiring only if, "on or before the day [the] individual begins work," the employer had requested a certification in writing or had already received such certification. I.R.C. § 51(d)(16)(A). This timing requirement generally would have the effect of rendering the tax credit available only to employers who at the time of hiring were aware of an individual's status as a public assistance recipient.

The ERTA did not address the rules governing certification for tax years commencing prior to December 31, 1981, *i.e.*, it did not indicate whether the certification timing requirements therein served to clarify or modify the prior controlling law applicable for WIN credits. Not unexpectedly, given this ambiguity employers filed claims with the IRS seeking WIN credits for tax years prior to 1982 based on certifications requested and secured after employment had begun. In General Counsel Memorandum (GCM) 39604, dated February 26, 1987, an abstract of which was published on March 10, 1987, the IRS took the position that WIN tax credits could not be secured based on such post-hiring certifications. The IRS General Counsel stated: "We believe that unless an employee was certified by the appropriate agency before he was hired, he was not an eligible individual...."

In *Lucky Stores, Inc. v. Commissioner*, 92 T.C. 1151, 1989 WL 55669 (1989), the Tax Court disagreed with the General Counsel's interpretation and concluded that for tax years prior to the effective date of the 1981 ERTA amendments, a certification secured after hiring was sufficient to support a tax credit. Partially in response to the *Lucky Stores* decision, Congress addressed the timing requirements for the certification for pre–1982 tax years in the Omnibus Budget Reconciliation Act of 1989 (the 1989 Act), Pub.L. No. 101–239, 103 Stat. 2106, 2381. The 1989 Act, in Section 7644(a), provided that for tax years prior to 1982, tax credits are available only for an employee "who has been certified (or for whom a written request for certification has been made) on or before the day the individual began work for the taxpayer by the Secretary of Labor or by the appropriate agency of State or local government." In Section 7644(b), however, the 1989 Act went on to provide that this timing requirement is made effective only "for purposes of credits first claimed after March 11, 1987." Hence, in 1989, Congress determined to address the certification requirement for pre–1982 tax years on a retroactive basis. In the context of Tax Court precedent that permitted an employer to rely upon post-hiring certifications to support a WIN tax credit for tax years prior to 1982, Congress adopted a law that retroactively disallowed such post-hiring certifications where an employer did not "first claim" the tax credit until after March 11, 1987, *i.e.*, after the GCM was first published.

### B.

Congress eliminated the pertinent tax credit in 1984. Pub.L. No. 98–369, 98 Stat. 833. Prior thereto, Kidde had hired numerous individuals on public assistance. Kidde was aware that some were eligible for WIN tax credits at the time they were hired. Before these individuals began work, Kidde obtained the requisite certification and received WIN tax credits for these employees. Kidde did not discover, however, until years later, that certain other employees had been on public assistance at the time they were hired.

In May 1985, Kidde received a proposal from a consulting firm, SRC Services, Inc. (SRC), to conduct a WIN tax credit study for Kidde. The proposal ultimately matured into a contract pursuant to which SRC, in exchange for a contingent fee, would search employment lists and public records to assess and secure the requisite certification for eligible employees hired by Kidde between September 26, 1978, and December 31, 1981. Plaintiff bases its claim for a refund in Count IV on SRC's work. Kidde seeks tax credits for employees it hired during tax years 1980 and 1981 with respect to whom Kidde had not sought or received certifications until years after their hiring. The availability of tax credits for these employees during tax years 1980 and 1981 is relevant to tax years 1977 and 1978 because Kidde suffered losses during tax years 1980 and 1981 and under the applicable carry-back procedure, I.R.C. § 50A(b)(1) (1954), any additional WIN credits granted for tax years 1980 and 1981 could be rolled back and applied to tax years 1977 and 1978.

Defendant does not dispute that certain Kidde employees had been receiving public assistance at the time they were hired and that Kidde potentially could have claimed WIN tax credits for these employees. Defendant's argument instead focuses on the fact that Kidde did not request or secure the

requisite certifications until years after the employees were hired. Defendant contends that Kidde "first claimed" the credits after March 11, 1987, and hence, pursuant to the 1989 Act, cannot rely upon post-hiring certifications to obtain WIN credits.

### C.

On March 12, 1987, one day after the statutory cut-off date retroactively adopted in the 1989 Act, plaintiff filed Forms 1120X requesting refunds for tax years 1977 and 1978 based on the disputed WIN tax credits. Defendant takes the position that in applying the 1989 Act, the filing date of Form 1120X is the date on which the tax credit claim is "first filed" and hence, Kidde is not entitled to the disputed WIN credits. Plaintiff responds that although Kidde did not formally file its refund claim until March 12, 1987, it had advised the IRS prior to that date that Kidde was seeking the WIN tax credits in issue and had supplied the IRS with documentation showing its entitlement to the credits. Relying upon a doctrine established in case law that is known as the informal claim doctrine, plaintiff contends that under these circumstances, Kidde should be deemed to have "first filed" its claim prior to the March 11, 1987, deadline.

■ The informal claim doctrine has been applied in certain situations where, prior to expiration of the applicable statute of limitations for seeking a credit or refund, a taxpayer places the IRS on notice that the taxpayer believes that he or she is entitled to a refund but does not file a formal claim requesting such refund until after the expiration of the applicable statute of limitations. In *United States v. Kales*, 314 U.S. 186, 194, 62 S.Ct. 214, 218, 86 L.Ed. 132 (1941), the Supreme Court explained the informal claim doctrine follows:

> This Court, applying the statute and regulations, has often held that a notice fairly advising the Commissioner of the nature of the taxpayer's claim, which the Commissioner could reject because too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim, where formal defects and lack of

specificity have been remedied by amendment filed after the lapse of the statutory period.

■ Courts assess whether a taxpayer has satisfied the requirements for an informal claim on a case-by-case basis and consider the totality of the facts presented. *See American Radiator & Standard Sanitary Corp. v. United States*, 162 Ct.Cl. 106, 114, 318 F.2d 915, 920 (1963); *Newton v. United States*, 143 Ct.Cl. 293, 300, 163 F.Supp. 614 (1958). In *Newton*, 143 Ct.Cl. at 300, 163 F.Supp. 614, the court explained that "[t]he basic underlying principle [of an informal claim] is the necessity to put the [IRS] on notice of what the taxpayer is claiming and that he is in fact making a claim for refund." In *American Radiator*, the court maintained this focus on the adequacy of the notice to the IRS, as follows:

> Informal refund claims have long been held valid. But they must have a written component, and should adequately apprise the [IRS] that a refund is sought and for certain years. It is not enough that the [IRS] have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer. On the other hand, the writing should not be given a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content. The focus is on the claim as a whole, not merely the written component. In addition to the writing and some form of request for a refund, the only essential is that there be made available sufficient information as to the tax and the year to enable the [IRS] to commence, if it wishes, an examination into the claim.

162 Ct.Cl. at 113–14, 318 F.2d at 920 (citations omitted).

Plaintiff argues that the informal claim doctrine should be available when applying the March 11, 1987, deadline set forth in the 1989 Act, that plaintiff has satisfied all of the requirements to demonstrate that Kidde submitted an informal claim prior to March 12, 1987, and hence, that the court should treat

Kidde's claim as timely filed and allow plaintiff to rely upon post-hiring certifications.

### D.

Plaintiff bases its contention that Kidde filed an informal claim prior to March 12, 1987, on interactions between an IRS auditor, Seymour Alexander, and two employees in Kidde's tax department, Robert Neumann and his supervisor, Francis Lloyd. Alexander was team auditor in charge of auditing Kidde's returns for tax years 1983 and 1984. During 1986 and 1987, Alexander spent three to four days per week at Kidde's headquarters in an office near Neumann's office. Neumann and Alexander maintained a cordial, cooperative relationship and communicated frequently. Neumann considered it inconsistent with their cooperative relationship for Kidde to file a formal claim with the IRS without first advising Alexander of the basis of the claim and attempting to resolve the matter on an informal basis. Indeed, on prior occasions, Alexander and Neumann had discussed and resolved issues in Kidde's favor without Kidde having to file a formal claim. Consistent with their relationship, during one of their frequent meetings, Neumann informed Alexander that SRC was performing work for Kidde related to WIN tax credits and that Kidde likely would file a WIN tax credit claim based on that work. Thereafter, on approximately July 31, 1986, Kidde received from SRC black binders containing lists of Kidde employees hired while on public assistance, broken down by subsidiary or division and year of hiring, and certifications from public assistance agencies of these employees' eligibility for WIN tax credits. During the fall of 1986, Neumann presented these black binders to Alexander along with a summary spread sheet and briefly discussed with Alexander Kidde's contentions. Alexander informed Neumann that he had responsibility within the IRS for the claimed WIN tax credits for tax year 1983 but not the other tax years covered in the binders. (Kidde had filed an appeal and protest to notices issued by the IRS of a proposed deficiency covering those other years and the appeals and protests were being handled by the IRS appeals office.) Based on his discussions with Neumann, Al-

exander understood that Kidde believed that it was entitled to WIN credits for the employees identified in the black binders in the total amounts set forth in the summary spread sheet, and that the information in the binders substantiated Kidde's entitlement to those credits.

Alexander thereafter reviewed the material in the black binders applicable to tax year 1983 in sufficient detail and concluded that the binders provided information adequate to assess the validity of the claim for that year. As to the other tax years, Alexander reviewed the material only briefly and not in sufficient detail to come to a final conclusion that the information supplied supported the entire amount sought in the claim. Alexander testified at trial, in effect, that he interpreted Kidde's actions as constituting an informal claim for tax year 1983 but that he could not address that claim on the merits because he was awaiting policy guidelines from the IRS concerning the adequacy of certifications, such as those contained in the black binders, that were first obtained after the employees were hired. That guidance ultimately came in the form of the GCM described above which disallowed such retroactive certification.

### E.

In evaluating plaintiff's contention that Kidde "first claimed" the WIN credits for tax years 1977 and 1978 prior to March 12, 1987, it is necessary initially to determine whether the informal claim doctrine applies when assessing the date on which a WIN tax credit is "first claimed" under Section 7644(b) of the 1989 Act, and then, if it does, whether Kidde satisfied the requirements for application of that doctrine.

▇▇▇▇ Turning first to the issue of the applicability of the informal claim doctrine to Section 7644(b), the pertinent issue in cases in which courts have invoked the informal claim doctrine is the date on which the taxpayer filed its "claim" seeking a refund. For example, the statute of limitations contained in I.R.C. § 6511(a) provides as follows:

*Claim for credit or refund* of an overpayment of any tax imposed by this title in

respect of which the taxpayer is required to file a return *shall be filed* by the taxpayer *within 3 years* from the time the return was filed *or 2 years* from the time the tax was paid, whichever of such periods expires the later . . . .

(Emphasis added.) Statutes of limitations established by Congress for suits against the United States are conditions of Congress' waiver of sovereign immunity and may not be extended by the courts. *See Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 1819–20, 75 L.Ed.2d 840 (1983). Hence, in applying Section 6511(a), the central issue is whether the taxpayer filed its "claim" before or after the end of the applicable two- or three-year statutory period. Although the courts may not extend a statute of limitations period, the courts have responsibility to resolve disputes as to the date on which a claim was filed for purposes of applying that limitation. It is in connection with this function that the courts have employed the informal claim doctrine. Courts have concluded that a request for a refund made within the statutory period that does not comply with all of the formal requirements for a "claim" set forth in IRS regulations,[9] nevertheless constitutes a timely filed "claim for . . . refund" if all of the requirements described above for invocation of the informal claim doctrine are present.

The court's application of the relevant language in Section 7644(b) of the 1989 Act, *i.e.,* "first claimed after March 11, 1987," requires essentially the same focus as the court's inquiry under Section 6511(a) in that in both cases the court must assess whether the taxpayer submitted an adequate "claim" prior to the critical date specified in the statute. Ordinarily, when the identical word is used in two related statutes, such as the word

"claim" in Sections 6511(a) and 7644(b), courts will give the word the same meaning when interpreting both statutes. *Commissioner v. Lundy,* 516 U.S. 235, 248–50, 116 S.Ct. 647, 655, 133 L.Ed.2d 611 (1996); *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 2503–04, 110 L.Ed.2d 438 (1990). Hence, absent some compelling reason suggesting a contrary approach, the prerequisites for filing a "claim" under Section 6511(a) should be the same as the prerequisites for filing a "claim" under Section 7644(b). In other words, to the extent that certain actions, although "informal," are deemed sufficient to constitute a "claim" within the definition provided in Section 6511(a), those same actions ordinarily would fall within the definition of the word "claim" in Section 7644(b).

In its post-trial brief, defendant expressly acknowledges that precedent addressing the informal claim doctrine is not inapplicable to Section 7644(b) and that "there is no legal authority for construing the word 'claim' differently in the context of the WIN credit provisions and the statute of limitations provisions." In addition, defendant does not cite any language in the 1989 Act that suggests that Congress intended to exclude informal claims when applying Section 7644(b). Rather, defendant argues that application of the informal claim doctrine in many of the decided cases rests on concepts of equity and fairness and that these concepts do not apply herein. Defendant argues that Congress enacted Section 7644 of the 1989 Act to end an unintended and inequitable tax giveaway in that employers were receiving an incentive (*i.e.,* a credit) for hiring individuals on public assistance when at the time of hiring, the employers did not even know that the individuals were receiving such assistance.

---

**9.** The Internal Revenue Code provides that no suit for a tax refund may be maintained until a claim for a refund has been filed in accordance with the applicable Treasury Regulations. I.R.C. § 7422(a). As to the definition of what constitutes a claim, Treas. Reg. § 301.6402–2(b) provides:

> The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. The statement of the grounds and facts must be verified by a written

declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit. For claims by corporations, Treas. Reg. § 301.6402–3(a)(3) further provides:

> In the case of an overpayment of income taxes for a taxable year of a corporation . . ., a claim for refund shall be made on Form 1120X ("Amended U.S. Corporation Income Tax Return").

But in Section 7644, Congress expressly decided not to preclude the use of post-hiring certifications for all previously filed WIN tax credit claims. Quite to the contrary, except in situations where the taxpayer "first claimed" the tax credits after March 11, 1987, Congress left undisturbed the Tax Court's *Lucky Stores* decision which allowed the taxpayer to rely on post-hiring certifications. The only evidence presented by the parties as to Congress' selection of March 11, 1987, as the cut-off date and Congress' view of the equities involved in that selection is the following statement made by Chairman Rostenkowski when introducing the bill that ultimately evolved into Section 7644:

> The requirement that certification be requested on or before the date the employee commenced work with the employer is applied only to credits first claimed after March 11, 1987, because the position of the Internal Revenue Service was not publicly known until the publication of GCM 39604 on that date. Taxpayers who claimed the credit on or before March 11, 1987, were acting in reliance on the availability of the credit for workers for whom certification was requested at a later time. Taxpayers who first claimed the credit after March 11, 1987, were put on notice by publication of the GCM, and cannot claim to have acted in such reliance.

> The bill I am introducing today upholds the principle that retroactive certification is an inefficient use of a tax credit, yet in fairness to taxpayers who acted in reliance on the availability of the WIN credit, applies this principle only to those taxpayers who have received adequate notice of its application.

This statement supports the conclusion that Congress decided that equity and fairness dictated in favor of allowing taxpayers to rely upon post-hiring certifications when those taxpayers had relied upon the retroactive availability of WIN credits and submitted a claim prior to the publication of the GCM. Herein, Kidde certainly relied upon the availability of WIN credits when it entered its contract with SRC and submitted SRC's

work product to the IRS and indicated its entitlement to a refund prior to publication of the GCM. Moreover, Chairman Rostenkowski's statement says nothing at all about the issue of when a claim should be deemed to have been submitted and certainly does not specify that he intended the word "claim" in his bill to have a different meaning than the word "claim" in Section 6511(a). Nor does Chairman Rostenkowski's statement suggest that he had concluded that it would be equitable and fair to refuse to grant a WIN credit to a taxpayer that had presented its request for a credit and refund to the IRS prior to March 12, 1987, simply because the taxpayer had failed to satisfy the formality requirements of IRS regulations.

Thus, based on the wording of Section 7644(b) and a review of the authorities presented by the parties, the court concludes that the informal claim doctrine applies to a determination as to when a WIN credit was "first claimed" under Section 7644(b).

### F.

■ This brings the court to the last issue under Count IV, which is whether Kidde has satisfied all of the requirements set forth in controlling precedent for application of the informal claim doctrine. The court concludes that it has. As described above, prior to submission of its formal claim on March 12, 1987, Kidde had given the IRS clear notice of the nature of its WIN credit claims. Based on Neumann's presentation of the black binders and summary spread sheet and related conversations with Neumann, Alexander understood that Kidde was contending that it was entitled to a WIN tax credit for tax years 1980 and 1981 and Alexander understood the basis for that claim. The black binders and summary spread sheet certainly satisfy the requirement for a written component to an informal claim. The binders contained sufficient information upon which the IRS could base an investigation into the merits of Kidde's WIN credit claim and the summary spread sheet sets forth the total amount of tax credit claimed in each tax year.[10]

---

10. Even if, as defendant contends, the binders did not represent SRC's final work product with

respect to all possible claims that might result from SRC's study, the binders did contain suffi-

The conclusion that plaintiff had presented an adequate informal claim is not undermined by plaintiff's intent at the time plaintiff gave notice and submitted the black binders and summary to Alexander, to file, if necessary to secure a credit, a formal claim prior to the expiration of the applicable statute of limitations. Under controlling precedent, such intent to later file a formal claim is not material where, in presenting the informal claim, the taxpayer put the IRS on notice that the taxpayer believed that a refund was due. *See, e.g., Kales,* 314 U.S. at 191, 62 S.Ct. at 216–17 (characterizing as an informal claim the taxpayer's letter which protested the Commissioner's attempt to revalue the stock and asserted that the taxpayer "will claim the right to a refund if for any reason a revaluation [of the stock] shall be had"); *American Radiator,* 162 Ct.Cl. at 116, 318 F.2d at 921 (finding an informal claim existed even though the auditor to whom the taxpayer had presented the informal claim was under the impression that "formal refund claims would be filed and that he would consider them").

Nor is the existence of an informal claim negated by the failure of the black binders and summary spread sheet to advise Alexander that the WIN credits earned in 1980 and 1981 would be carried back to and claimed for tax years 1977 and 1978. After submission of the binders and spread sheet but prior to March 12, 1987, Neumann had given Alexander a separate worksheet showing the various credits Kidde claimed and how they would be carried back. Hence, the IRS was on notice as to the tax years affected. Moreover, in *American Radiator,* 162 Ct.Cl. 106, 318 F.2d 915, the court applied the informal claim doctrine where the written component

consisting of notations on the taxpayer's 1949 tax return concerning the excess cost of replacement inventory purchased in that year did not specify the tax year for which a refund would result. The years were not identified until the formal claim was filed. The court concluded that in light of the auditing agent's detailed knowledge of the source and size of the claim, "plaintiff was not required, for this informal claim for refunds all of one type, to match particular amounts to particular years." *Id.* at 116, 318 F.2d at 921.[11] Herein, Alexander had detailed knowledge of the source and size of the claim.

The fact that the IRS appeals division rather than Alexander had authority within the IRS over the claims for tax years 1977 and 1978 also is not inconsistent with the existence of an informal claim. It is not necessary for a taxpayer to direct the information that constitutes an informal claim to the precise IRS official who will consider that claim. *See Night Hawk Leasing Co. v. United States,* 84 Ct.Cl. 596, 18 F.Supp. 938, 941 (1937) (a taxpayer's notations on the backside of two checks protesting payment constitute informal claims even though the checks were presented to the Collector of Internal Revenue and the Commissioner never saw them); *Wall Industries, Inc. v. United States,* 10 Cl.Ct. 82, 101 (1986) (applying the informal claim doctrine even though the auditor to whom the taxpayer provided the information might not be the auditor who would process the formal claim). Indeed, the auditor in the IRS appeals office responsible for the tax years in issue testified that had Kidde submitted the black binders to him, the appeals division would have sent the materials to Alexander or a similar auditor for review.

cient information so as to alert the IRS that Kidde was seeking WIN credits for specific employees and to allow the IRS to assess the validity of those claims. The court in *American Radiator* noted that "[a]n informal claim which is partially informative may be treated as valid even though 'too general' or suffering from a 'lack of specificity'—at least where those defects have been remedied by a formal claim filed after the lapse of the statutory period but before the rejection of the informal request." 162 Ct.Cl. at 116–17, 318 F.2d at 921 (citing *Kales,* 314 U.S. at 194, 62 S.Ct. at 218).

11. In *Kuehn v. United States,* 202 Ct.Cl. 473, 480 F.2d 1319 (1973), the taxpayer's improper attempt to carry forward a 1965 loss onto his 1968 tax return was not considered an informal claim for refund for tax years 1962 and 1963, the years to which the loss should have been applied. By contrast, herein Kidde supplemented the black binders with a worksheet showing how credits would be carried back. Hence, the IRS was on notice that, to the extent the credits could not be applied to the year in which they arose, they would be carried back to the years at issue here.

Given Alexander's general responsibilities within the IRS, Neumann's interactions with Alexander were sufficient to put the IRS on notice of the pertinent claim.

 Defendant argues that the court cannot apply the informal claim doctrine herein because a *sine qua non* for an informal claim, which is lacking here, is some action by the IRS that in effect constitutes a waiver by the IRS of its right under its regulations to insist upon presentation of a formal claim prior to expiration of the statute of limitations. Defendant relies upon *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 297, 65 S.Ct. 1162, 1164–65, 89 L.Ed. 1619 (1945), in which the Supreme Court noted that the IRS has the power to waive its own regulations and consider the "informal claim" on its merits. Defendant contends that the IRS herein could not be said to have waived the formality requirements for the WIN credits earned in tax years 1980 and 1981 because Alexander had informed Neumann that he would not address the claims for WIN credits other than those for tax year 1983, the only year for which he was responsible.

But Alexander's actions arguably can be viewed as a waiver of the IRS's formality requirement for the WIN credits for tax years 1980 and 1981. Alexander considered the merits of Neumann's informal submission as it related to tax year 1983 and concluded that the information provided therein was sufficient to constitute an informal claim and to demonstrate the employees' status on public assistance. Alexander could not take action on the WIN credit claim for tax year 1983 because the IRS had not yet resolved the overarching issue of whether a taxpayer could base a WIN credit claim on a certification first secured after the employee was hired. In this factual setting, despite Alexander's statement that he personally would not review the WIN credits allegedly earned during tax years 1980 and 1981, it would be reasonable for Kidde to have inferred from Alexander's actions that the IRS would consider Kidde's claims with respect to tax years 1980 and 1981 on the basis of the information in the black binders and the upcoming IRS decision on post-hiring certification in the same way Alexander considered Kidde's claims for tax year 1983. Alexander reasonably led Kidde to believe that the only obstacle to the IRS's consideration of Kidde's entire WIN credit claim was the impending issuance of the GCM rather than the informality of the presentation of that claim. Indeed, by suggesting that Neumann and Lloyd present the black binders to the IRS appeals division, Alexander encouraged Kidde to believe that the IRS would consider Kidde's claim despite its informality. Hence, Alexander's actions, taken as a whole, reasonably suggested that the IRS would not enforce its own regulations with respect to the formality of Kidde's claim.

 In any event, contrary to defendant's arguments, under precedent binding on this court, a determination that the IRS waived the regulations that require a claim to satisfy certain formalities is not a *sine qua non* for application of the informal claim doctrine. In *Kales,* the Supreme Court based its conclusion that an informal claim existed primarily on the fact that the taxpayer had provided the Commissioner with adequate notice of her right to a refund. 314 U.S. at 195, 62 S.Ct. at 218. The portion of *Kales* that discusses waiver is prefaced with the following statement which indicates that the Court would have reached the same result even if the IRS had not proceeded to consider the claim on the merits: "If the point were more doubtful than we think it is, it would be resolved by the consistent administrative treatment of respondent's letter ... and the later amendment as a claim for refund." *Id.* at 196, 62 S.Ct. at 219. In any event, courts have not interpreted *Kales* as requiring affirmative government conduct constituting a waiver and have applied the informal claim doctrine in situations where the IRS did not consider the informal claim on its merits but merely failed to reject the informal claim before the statute of limitations expired. *See Cumberland Portland Cement Co. v. United States*, 122 Ct.Cl. 580, 593, 104 F.Supp. 1010 (1952) (the court distinguishes *Bonwit Teller & Co. v. United States*, 283 U.S. 258, 51 S.Ct. 395, 75 L.Ed. 1018 (1931), on the ground that in *Bonwit,* "the Commissioner himself treated the letter as an informal claim," but the court neverthe-

less applies the informal claim doctrine on the ground that the Commissioner had failed to reject the request by the taxpayer prior to expiration of the statute of limitations); *Jones v. United States,* 78 Ct.Cl. 549, 557, 5 F.Supp. 146, *cert. denied,* 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934) (applying the informal claim doctrine where the IRS placed the letter constituting the written component of the informal claim in IRS files without taking any action on it). In *Newton,* 143 Ct.Cl. at 300, 163 F.Supp. 614, the court stressed as follows: "Necessarily each case must be decided on its own peculiar set of facts with a view towards determining whether under those facts the Commissioner knew, or should have known, that a claim was being made. We believe that this is the predicate of an informal claim...." Herein, Alexander not only knew of Kidde's claim, but also was provided with what he himself acknowledged was sufficient information for the IRS to investigate the merits of that claim.

*Conclusion*

For the reasons set forth above, for tax year 1978, plaintiff is entitled to deduct from its income its payments to National covering the period June 1 through December 31, 1978, that National in turn ceded to KIC to cover claims against Kidde's wholly owned subsidiaries. Plaintiff is not entitled to deduct from its income its payments to National covering any period prior to June 1, 1978, with respect to its subsidiaries. For tax years 1977 and 1978, plaintiff is not entitled to deduct from its income any of its payments to National with respect to the divisions within Kidde's own corporate structure. As to WIN tax credits for 1977 and 1978, plaintiff "first filed" its claim prior to the March 11, 1987, deadline and hence is entitled to such a refund. Accordingly, on or before February 2, 1998, the parties shall file a stipulation as to the amount due plaintiff pursuant to this decision.

IT IS SO ORDERED.